# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| B. MICHELLE HARRIS, | ) |
| 4505 Fifth Street, N.W. | ) |
| Washington, D.C.  2001 | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   **Case No. 1:19-cv-2915** |
| | ) |
| TRUSTEES OF THE UNIVERSITY | )   **JURY TRIAL DEMANDED** |
| OF THE UNIVERSITY OF THE DISTRICT OF COLUMBIA, | ) |
| 4200 Connecticut Avenue, N.W., Building 39 | ) |
| Washington, D.C.  20008 | ) |
| | ) |
| Serve:  James Murphy | ) |
| OGLETREE, DEAKINS, NASH, SMOAK & | ) |
| STEWART, P.C. | ) |
| 1909 K Street, N.W., Suite 1000 | ) |
| Washington, DC. 20006 | ) |
| | ) |
| and | ) |
| | ) |
| SABINE O'HARA, | ) |
| 4200 Connecticut Avenue, N.W., Building 39 | ) |
| Washington, D.C.  20008 | ) |
| | ) |
| Serve: Sabine O'Hara | ) |
| | ) |
| Defendants. | ) |

_____ )

## COMPLAINT

Plaintiff, B. MICHELLE HARRIS (hereinafter "Dr. Harris" or "Plaintiff"), by and through

counsel, Eric L. Siegel and Evan M. Lisull of Kalbian Hagerty, LLP, hereby brings this action against

the TRUSTEES OF THE UNIVERSITY OF THE DISTRICT OF COLUMBIA (hereinafter "UDC"

or "Employer") and SABINE O'HARA ("O'Hara") (collectively referred to as "Defendants") to

recover for damages resulting from race and national origin discrimination and retaliation in

violation of 42 U.S.C. § 1981, as amended, retaliation under the False Claims Act (31 U.S.C. §

3730(h)), the First Amendment to the U.S. Constitution and the D.C. Human Rights Act, D.C. Code §§ 2-1402.11 *et seq.* (for the period from December 21, 2016 forward, per the Court's prior Order), and the D.C. Whistleblower Protection Act, D.C. Code §§ 1-615.51, *et seq.*, and for cause states:

## JURISDICTION AND VENUE

1.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 1981, First Amendment to the U.S. Constitution, and the False Claims Act (31 U.S.C. § 3730(h)).

2.      This Court has supplemental jurisdiction over Plaintiff's state law claims brought under the D.C. Human Rights Act, D.C. Code §§ 2-1402.11 *et seq.*,, for the period from December 21, 2016 forward and the D.C. Whistleblower Protection Act, D.C. Code §§ 1-615.51, *et seq.*, for actions taken within one (1) year of the filing this Second Amended Complaint pursuant to 28 U.S.C. § 1367(a).  In particular, those claims arise from a common set of operative facts and are so related to the claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy.

3.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in the District of Columbia.

## THE PARTIES

4.      Plaintiff B. Michelle Harris is African-American, a resident of the District of Columbia, of lawful age, a citizen of the United States, and, at the time of this filing, is employed as a member of the teaching faculty of the Defendant Board of Trustees of the University of the District of Columbia ("UDC").

5.      Defendant UDC is the governing body of the University of the District of Columbia, which

is an agency of the District of Columbia government.

6.    Defendant Sabine O'Hara, during all times relevant to this Complaint, is Caucasian and has been the Dean of the College of Agriculture, Urban Sustainability and Environmental Sciences ("CAUSES") at the UDC. Dr. Sabine O'Hara was born in Germany

## STATEMENT OF FACTS

7.    Dr. B. Michelle Harris was born and raised in Washington, D.C.

8.    She is a tenured member of the UDC faculty.

9.    Dr. Harris has served for more than five years as an Executive Board member of the Faculty Association (faculty union) of the UDC.  She has also been an active member of the Faculty Senate of UDC.

10.   Dr. Harris possesses four academic degrees: a B.A. in chemistry from College of the Holy Cross (Worcester, Massachusetts); an M.S. in nutrition from Framingham (Massachusetts) State University; an M.S. in public health from Harvard University; and a Ph.D. in nutrition from the University of Maryland.

11.   She has received numerous fellowships and awards for science during her career, from such distinguished organizations as the National Bureau of Standards (Analytical Chemistry Division), the Harvard University School of Public Health, the Network of Minority Research Investigators (National Institutes of Health), and the American Association for the Advancement of Science.

12.   Dr. Harris was hired by Defendant UDC as an Assistant Professor of Dietetics and Nutrition in 2006 in the College of Arts and Science ("CAS").  She was subsequently transferred to the College of Agriculture, Urban Sustainability and Environmental Sciences ("CAUSES")

upon its establishment.

13.  At the time she was hired by UDC, Dr. Harris possessed more than ten (10) years of progressive experience in teaching in a college or university.

14.  At the time she was hired by UDC, she also possessed more than fifteen (15) years of progressive experience as a professional nutritionist and dietitian.

15.  Notwithstanding her experience in teaching and her experience as a professional nutritionist and dietitian, Defendant UDC hired Dr. Harris at only the Assistant Professor level, which commanded a lower salary than someone at her level of education and academic and field experience.

16.  In 2012, Dr. Harris was promoted by UDC to Associate Professor in CAUSES.

17.  Beginning in or around 2012, Dr. Harris noticed that UDC was hiring younger, white faculty members who had little or no teaching experience, yet UDC was paying the new instructors the same as, or more than, what UDC was paying her in terms of compensation.

18.  Defendant Sabine O'Hara began supervising Dr. Harris in or about 2012.

19.  In 2013, in carrying out her professorial responsibilities, Dr. Harris advocated to the U.S. Department of Agriculture ("USDA") on behalf of disadvantaged students in an effort to secure additional funding for D.C. students attending UDC.  Specifically, she wrote a letter to then-Secretary Vilsack of the USDA requesting ideas for funding.  This effort was prompted by the non-renewal of a disadvantaged students grant for the UDC Nutrition Program.

20.  As a result of sending that letter, Dr. O'Hara summoned Dr. Harris to a meeting.  At that meeting, to Dr. Harris' surprise, rather than commend her for her creativity and advocacy on

behalf of disadvantaged students, Dr. O'Hara stated, "Dr. Harris, you have extraordinary intelligence, but you lack social intelligence." Dr. Harris responded, "What do you mean by social intelligence?" Dr. O'Hara replied, "If there were administrative or managerial positions, you would not get it."

21. Dr. Harris took offense to Dr. O'Hara's disparaging and demeaning comment, which she attributed to her race as a result of the reference to "social intelligence."

22. In 2014, and again in 2015, Dr. Harris protested to UDC officials that the African-American staff and students in the UDC Department of Nutrition and Dietetics were being treated differently than other UDC students and faculty because of their race.

23. Starting in or around February 2015, Dr. Harris was vocal and protested to UDC officials that UDC was discriminating against a longstanding professor in the Nutrition Department, Professor Barbara Harvey. Professor Harvey is an African-American faculty colleague who had been tenured in the UDC Department of Nutrition and Dietetics for more than 30 years.

24. Dr. Harris' protests on behalf of Dr. Harvey included, but were not limited to, claims of disparate treatment on account of her race and national origin.

25. In or around June 2015, Dr. Harris and Professor Harvey filed complaints of race discrimination against Defendant UDC (and Defendant O'Hara) with the U.S. Equal Employment Opportunity Commission.

26. In or around August 2015, as a result of ongoing concerns about how land grant USDA funds were being used by Defendant O'Hara to fund "Cooperative Extension"[1] staff to teach full-

---

[1]     Cooperative Extension was established by the Smith-Lever Act to authorize work between land-grant colleges and USDA. Land-grant colleges were authorized under the Morrill Act to extend

and part-time academic course loads rather than performing Extension clinical and/or field work duties and related teaching with students, Dr. Harris raised the issue to the Faculty Association (the union) and the UDC Faculty Senate.

27.    Defendant O'Hara became aware of Dr. Harris' escalation of her concerns outside of CAUSES and became angry with her.

**Defendant O'Hara Begins Her Campaign to Block Dr. Harris' Promotion to Full Professor**

28.    In or around August 2015, Dr. Harris was notified that she earned a space in the August 2015 National Institute on Minority Health and Health Disparities ("NIMHD") Translational Health Disparities Course. This is a highly competitive opportunity that is awarded to scholars and practitioners who contribute to reducing health disparities.

29.    Despite such recognition by regional and national organizations, Defendant O'Hara did not recognize Dr. Harris for this scholarship and service, despite the fact that Dr. Harris included the certificate of this achievement in her performance evaluation portfolio. That portfolio is used to evaluate the job performance of a given faculty member. Dr. Harris again felt demeaned by Defendant O'Hara by this lack of recognition.

30.    On or about March 29, 2016, in response to performance evaluation portfolios being submitted to the faculty Department Evaluation and Promotion Committee ("DEPC") – a departmental committee which conducts annual assessments for faculty evaluations and promotions – Dr. Harris protested to Dr. Prema Ganganna (Indian-American and her immediate supervisor) and Associate Dean of CAUSES Elgloria Harrison (African-

---

education beyond the elite to average citizens. To this end, Cooperative Extension staff go into a given community or have community members come to their facilities, farms and/or gardens to provide instruction and education for citizens to better themselves in terms of economics and health.

American), and copied O'Hara, the Faculty Senate President, and others, that certain persons should not be evaluated because they were not regular faculty.

31.   Dr. Harris stated in her email: "It seems to have been a long-term practice of administrators at the University of the District of Columbia to make up rules as they go along to fit their objectives. These on-the-fly rules seem to me to be focused on punishing some and rewarding others unfairly.  I contend that this needs to stop."

32.   On or about July 11, 2016, Dr. Harris attended a mediation in an effort to resolve her EEOC complaint.  Upon information and belief, Drs. O'Hara and Ganganna were aware of, and/or participated in, the mediation through UDC's General Counsel.  Dr. Harris was unable to resolve the dispute, so her EEO charge continued to be investigated.

### Dr. Harris Engages In Protected Activity By Protesting Discrimination Against Professor Harvey and Voicing Concerns About Misappropriation Of Federal Grant Funds

33.   On or about September 29, 2016, Dr. Harris, who had been supporting Professor Harvey with her union grievance, in which she (Dr. Harris) alleged, among other allegations, disparate treatment on account of her race and national origin, attended the arbitration on multiple days and took notes of witness testimony, including Dr. Ganganna, Chairperson of the Department of Health, Nursing and Nutrition and Dr. Harris' immediate supervisor.

34.   At that time, Defendant O'Hara was also aware that Dr. Harris had engaged in protected activity to support Professor Harvey's discrimination claims and other allegations.

35.   On or about November 10, 2016, Dr. Harris testified at Professor Harvey's arbitration on her behalf.  Defendant O'Hara was well aware of Dr. Harris' continuing support for Professor Harvey, including her claims of disparate treatment on account of her race and national origin.

7

36.   On or about December 2, 2016, Dr. Harris attended a Special Meeting of the UDC Board of Trustees.  Defendant O'Hara was also in attendance.  The meeting dealt with a proposed program for CAUSES.  At that meeting, Dr. Harris provided testimony in opposition to the program proposal.  In particular, Dr. Harris testified that full-time staff of the Cooperative Extension Program (land grant) were listed as faculty for this proposed academic program, which, in Dr. Harris' view, was a misappropriation of federal funds for responsibilities that should be borne by the District of Columbia and by non-land grant revenue streams of UDC.

37.   On or about February 10, 2017, at 10:00 a.m., USDA evaluators (from whom UDC receives federal land grant funds) visited UDC campus and, specifically, CAUSES faculty to ensure that UDC was serving all wards of the City in equitable amounts.  During this site visit, Dr. Harris reported to one of the evaluators that she believed that UDC was misappropriating USDA land grant funds to pay non-faculty Cooperative Extension staff members to teach full academic course loads in CAUSES.

38.   Dr. O'Hara eavesdropped on the conversation and it appeared that she was straining to hear what Dr. Harris and the USDA representative were discussing.  Dr. Harris was undeterred by Dr. O'Hara's apparent attempt to intimidate her from speaking to this USDA auditor.

39.   Later that day on February 10, Dr. Prema Ganganna (again, Dr. Harris' immediate supervisor) issued Dr. Harris a Letter of Counseling for alleged behavior issues pertaining to soliciting feedback from the Chairperson of the UDC Mathematics Department regarding math courses which were required courses for the CAUSES program.

40.   Upon information and belief, Defendant O'Hara either initiated that Letter of Counseling or participated in the decision to issue it to Dr. Harris.

41.    In response, on or about February 14, Dr. Harris wrote a detailed email to Dr. Ganganna and copied O'Hara, stating: "Until the last few years, I had always believed that you had a high level of cultural competence; however, your treatment of Professor Barbara S. Harvey and of me, both of whom are U.S.-born Black-American faculty members, contrasts with your treatment of other faculty members and instructors who are not U.S.-born Black Americans."

42.    In response to Dr. Ganganna's allegations regarding unprofessional behavior, Dr. Harris wrote:

> I have not received any prior indication that you or any other person in the University were offended by the fact that I am so zealous about my responsibility to carry out the mission of the University of the District of Columbia. Certainly, you and I have been close professional colleagues for more than ten years. At any other time, when you have needed to communicate with me for matters involving the program or the department, we have always had open communication. I cannot understand why you would need to send me a memorandum when our offices are just ten feet apart. I just do not understand what is going on from your end.

43.    In response to Dr. Ganganna's accusation that Dr. Harris referred to faculty women as "girls", she wrote: "I categorically deny referring to faculty members as "girls." I am a professional woman and as a culturally-competent educator, I do not use the term "girls" when referring to women. Likewise, I do not use the term "boys" to refer to men. The use of the term "girls" for women is something I find very offensive. The use of the term "girls" when referring to women, to me, is parallel to the use of the term "nigger" for Black Americans."

44.    In her Letter of Counseling, Dr. Ganganna accused Dr. Harris of violating tenets of shared governance, which includes mutual respect and avoiding portraying her Department negatively and unprofessionally.

45.    In response to Dr. Ganganna's statement about "shared governance" being a "two-way street," Dr. Harris replied: "I find it unconscionable for you to reference "Shared Governance" when Shared Governance is not actually in effect at the University of the District of Columbia. You

are not in the position to enlighten me about Shared Governance. Shared Governance is not present in the Nutrition and Dietetics Program, especially when you, the Chairperson, also hold the title of Director of the DPD. I have contributed an inordinate amount of time and effort to improving the DPD. I could do even more if I were given the authority to do so." Dr. Harris protested not being appointed to a leadership role in her Department.

46.     At that time, Dr. Ganganna held dual positions as Director of the UDC Didactic Program in Dietetics ("DPD") and Coordinator of the Undergraduate and Graduate Programs in Nutrition and Dietetics, while simultaneously occupying the position of Chairperson of the UDC Department of Health, Nursing and Nutrition.

47.     Defendant O'Hara appointed Dr. Ganganna to this Director of DPD position, despite denying Dr. Harris the same opportunity on several occasions previously even though she was certainly qualified for that position.

**On The Heels of Dr. Harris' Vocal Opposition to Discrimination and Allegedly Unlawful Use of Federal Funds, Defendant O'Hara Issues Dr. Harris a Low Performance Evaluation, Blocking Her Promotion to Full Professor**

48.     On or about February 20, 2017, Dr. Harris again had a conversation with a USDA representative about UDC's alleged misuse of federal land grant funds to pay Cooperative Extension staff to teach faculty courses, instead of using the funds for the use to which they were intended by the land grant.

49.     Within weeks of these conversations with USDA, Dr. Harris submitted her evaluation portfolio to her immediate supervisor (Dr. Ganganna), the DEPC, and Defendant O'Hara for evaluation.

50.     Specifically, on or about April 5, 2017, Dr. Harris submitted her faculty evaluation portfolio

10

to Dr. Ganganna, who had directly supervised her for many years.

51.   On or about May 15, 2017, Dr. Harris provided a memorandum in support of her performance evaluation in which she detailed her achievements during the evaluation year.

52.   Dr. Ganganna gave Dr. Harris very high ratings on her annual faculty performance review in each of the rated categories.

53.   The DEPC also conducted their parallel evaluation of Dr. Harris' job performance as a professor.

54.   Dr. Harris' peers on the DEPC also evaluated her outstanding in all respects.

55.   Despite outstanding evaluations of Dr. Harris' performance for 2016-2017 by Dr. Ganganna and the DEPC, Defendant O'Hara, on or about May 30, 2017, without any first-hand knowledge of Dr. Harris' faculty accomplishments or credentials, overrode their performance ratings given to Dr. Harris.  Defendant O'Hara gave Dr. Harris a significantly lower performance rating.

56.   At the time, Dr. Harris was eligible for promotion from Associate Professor to Full Professor, a promotion which would have resulted in a substantial increase in salary.

57.   The arbitrarily-lowered faculty appraisal given by Defendant O'Hara to Dr. Harris had a negative impact on Dr. Harris' chances for promotion.

58.   As a result of the actions of Defendant O'Hara in lowering the faculty evaluation scores of Dr. Harris, Dr. Harris was denied the opportunity to apply for promotion to the rank of Full Professor in 2017.  After appealing to the President in his role as Acting Chief Academic Officer, he acquiesced to Defendant O'Hara and upheld her lower performance rating.

59. Upon information and belief, Defendant O'Hara lowered the faculty rating of Dr. Harris in retaliation for, among other protected activities, Dr. Harris' filing an EEO complaint accusing Dr. O'Hara and UDC of discrimination and her outspoken criticism of Defendant O'Hara for allegedly misusing federal land grant funds to pay for academic teaching faculty.

**Defendant O'Hara Denies Dr. Harris Leadership Roles In Her Department**

60. Around the time when Dr. Ganganna left her position on the UDC faculty in June 2017, Dr. Harris was the only person on the faculty eligible to serve as Director of DPD.

61. Dr. Pier Broadnax, a long-time member of the UDC College of Nursing faculty and an African-American woman, was also eminently qualified to succeed Dr. Ganganna as Chairperson of the UDC Department of Health, Nursing and Nutrition.

62. On or about June 23, 2017, Dr. Harris wrote Defendant O'Hara requesting that she be appointed to serve in the position of Director/Coordinator of DPD and to have Dr. Ganganna provide orientation and transition to Dr. Harris for that leadership position.

63. Dr. Harris followed up her email to Defendant O'Hara with another email in which she wrote: "As a reminder, individuals who perform the duties of Coordinators (Directors) of the DPD are required to be Registered Dietitians. Assigning these duties to unqualified individuals would put the program in jeopardy in terms of compliance. My curriculum vita is on file, but I can forward you an updated one if you wish."

64. Defendant O'Hara did not respond. After some time, on or about July 10, 2017, Dr. Harris sought a meeting with O'Hara to discuss the Director of DPD matter further.

65. That day, Dr. Harris learned from an email from Defendant O'Hara that she was seeking to hire "visiting" professors for regular full-time positions in CAUSES. Dr. Harris immediately

12

emailed O'Hara and questioned her right to do so.  Dr. Harris also asked again to be considered for Director/Coordinator for Undergraduate DPD.

66.   After hearing no response from Defendant O'Hara, Dr. Harris appealed to President Ronald Mason to discuss the issue further.  President Mason replied that he would discuss the matter with Defendant O'Hara.

67.   Dr. Harris never heard back from either President Mason or Defendant O'Hara regarding the issues she raised.

68.   Instead of allowing Dr. Harris or Dr. Broadnax an opportunity to compete for either of the positions created by Dr. Ganganna's departure, Defendant O'Hara went outside UDC to hire two Caucasian persons as administrators that were "visiting professors" (William Pewen as Chairperson of the Department and Nancy Chapman as Director of the DPD), totally bypassing the two African-American faculty members (Harris and Broadnax) who, in terms of tenure and service to UDC, were more qualified for the positions than the Caucasians persons eventually hired by Defendant O'Hara.

69.   In the case of Professor Chapman, who is not a Ph.D., she had significantly less experience in academia and clinical work than Dr. Harris.

70.   Recall that Defendant O'Hara had previously told Dr. Harris that O'Hara would not consider promoting her because she did not have the right "attitude" and lacked "social intelligence" to get promoted to a "managerial or administrative position."

71.   With the departures of Professor Harvey and Dr. Ganganna, Dr. Harris was the only tenured faculty member left in the Nutrition and Dietetics Program in CAUSES and the only person in Dietetics and Nutrition eligible to serve on the Hiring Committee to interview the Nutrition

13

Program candidates to carry the two full-time course loads in the Program created by those departures.

72. Instead of allowing Dr. Harris to serve on the Faculty Hiring Committee, as is custom and longstanding practice at UDC, Dr. O'Hara recruited the candidates without notifying Dr. Harris, convened a Faculty Hiring Committee of her choosing in secret, and then made the announcement of the persons she had selected, Allison Miner (an African-African candidate who was hired to oversee the masters program in Nutrition and Dietetics, which had limited responsibility due to its lack of popularity and development as a program) and Nancy Chapman (a Caucasian who was hired to serve as Director of the DPD).

73. The two Caucasian administrators (one nutritionist (Nancy Chapman) and one public health professional (William Pewen)) and an additional African-American nutritionist (Allison Miner), selected by Dr. O'Hara, were not regular faculty members.

74. Dr. O'Hara circumvented the standards of faculty members by designating these three individuals as "Visiting Associate Professors." However, they were not visiting from any other institution of higher learning, but they were being paid out of the UDC budget.

75. Defendant O'Hara's exclusion of Dr. Harris from the Nutrition and Dietetics Faculty Hiring Committee was a violation of the Collective Bargaining Agreement between UDC and the UDC Faculty Association ("Union"). O'Hara's actions also were in violation of the accrediting standards set by the bodies which accredit the UDC Nutrition and Dietetics Program.

76. The actions of Defendant O'Hara in excluding Dr. Harris from the Nutrition and Dietetics Program Faculty Hiring Committee were retaliation for, among other activities, Dr. Harris

being outspoken about O'Hara's discriminatory behavior and challenging her use of federal land grant funds to pay for academic teaching faculty.

77.   Upon information and belief, Defendant O'Hara, as Dean of CAUSES, has actively favored and/or selected Caucasian and foreign-born applicants and employees for positions and assignments over American-born Black employees.

78.   Virtually all of the faculty members hired in CAUSES from outside UDC by Dean O'Hara have been non-African Americans, with the exception of Dr. Miner who presided over a nascent program with attendant limited responsibilities.

79.   On or about September 7, 2017, Dr. Harris submitted her application for promotion to Full Professor.   She was denied the opportunity to move it forward because of her low performance evaluation by Defendant O'Hara.

80.   On or about December 21, 2017, Dr. Harris filed the federal Complaint giving rise to this matter, alleging, among other claims, that she was discriminated against on account of her race national origin and retaliated against for protesting discrimination.

**Dr. Harris Continues To Protest Disparate Treatment And Improprieties At UDC**

81.   On or about January 30, 2018, Dr. Harris emailed Associate Chief Academic Officer Carl Moore, protesting the blatant disparate treatment to which she has been subjected by Dean O'Hara, including her performance evaluations and denials of promotion.   She highlighted the fact that O'Hara had engaged in "past adverse actions" against her.

82.   Dr. Harris protested a hostile work environment created by Dean O'Hara, who "is free to exercise seemingly unlimited power over faculty members…".

83. Dr. Harris recounted that in her last meeting with O'Hara, she (O'Hara) stated that Dr. Harris was "not ready" for a leadership role, despite the fact that she had been teaching at the UDC for eleven (11) years and had taken on various leadership roles in and outside of her Department.  Dr. Harris concluded her email by stating: "She [(O'Hara)] failed to explain what she meant by this.  When I asked, she stated that she would not elaborate.  The role of a dean includes developing the talents and skills of faculty members.  This is not what Dr. O'Hara has done for me."

84. Dr. Harris wrote additional emails to Dr. Moore that day to provide documentation to support her claims of lack of support by O'Hara.  In one such email, she stated: "The practice of paying "Visiting Faculty" from the coffers of the University of the District of Columbia is not supportive of maintaining strong academic programs. The practice of using land-grant dedicated funding for academic programs, likewise, is not sustainable, especially given that for formal "dual appointments" of land-grant staff for academic programs, separate sources of funding are used to pay faculty members with such joint appointments."

**Defendant O'Hara Again Downgrades Dr. Harris' Job Evaluation In 2018, Again Preventing Her From Advancing To Full Professor**

85. Within six weeks of appeal to Associate Chief Academic Officer Moore, in the Spring of 2018, Dr. Harris again received evaluation scores from her supervisor and from her faculty peers on the DEPC that would have been sufficient to qualify her for promotion from Associate Professor to Full Professor.

86. Within a short time after challenging Defendant O'Hara's disparate treatment of her to O'Hara's superiors, in or about May 2018, Defendant O'Hara again overrode the

performance evaluations of Dr. Harris' supervisor and the DEPC and gave Dr. Harris a lower performance evaluation.  This action effectively blocked Dr. Harris's efforts again to move from Associate to Full Professor.

**Defendant O'Hara Continues To Pass Over Qualified African-American Faculty Candidates And Shows Her True Motives**

87.   In or about June 2018, Dr. Harris served on a search committee for faculty for the Nutrition Department.  Dr. Harris had finally been appointed Chairperson of this committee. Of the two candidates selected by the search committee to recommend for hire, one, Dr. Veronica Oates, is African-American.  Dr. Oates scored high marks for the Nutrition Department search committee Evaluation and face-to-face interview.  Accordingly, the search committee recommended Dr. Oates for the position of Associate Professor of Nutrition.

88.   In July 2018, again, Dr. Harris requested that Defendant O'Hara appoint her as Director/Coordinator of DPD.

89.   On or about August 7, 2018, Dr. Harris learned of the non-selection of Dr. Oates for the faculty position.  She wrote O'Hara to inquire of her rationale.  Dr. Harris received no response.

90.   Finally, after more than three years of Dr. Harris seeking the appointment to Director of DPD, O'Hara appointed her to the position of Director/Coordinator of DPD.  Dr. Harris was selected for the position because Defendant O'Hara had no other options.  Dean O'Hara was also well aware that at that time that Dr. Harris' federal EEO lawsuit was still pending against UDC.

91.   Undeterred by the constantly demeaning actions taken by Defendant O'Hara against her, in or about September 2018 – after Dr. Harris was appointed to the position of Director

(Coordinator) of DPD – she met with Defendant O'Hara and requested an increase in salary to reflect the increase in responsibilities.  Defendant O'Hara denied that request.

92.     The denial was contrary to the practice of paying other non-African American faculty members for assuming these leadership roles in addition to their teaching responsibilities.

93.     Upon information and belief, Nancy Chapman, the prior Caucasian Director of the DPD, earned at least $10,000.00 more in compensation per year than Dr. Harris when she held that responsibility.  This was despite the fact that Dr. Harris had considerably more tenure at UDC and more experience and credentials as a faculty member.

94.     Upon information and belief, faculty who are Associate Professors who serve in leadership positions in their programs and departments receive additional compensation compared to those who do not hold such leadership positions.

95.     Nevertheless, Defendant O'Hara denied Dr. Harris additional compensation for carrying out the duties of Director of DPD, a leadership position in her department.

96.     On or about September 13, 2018, as a result of repeated actions by Defendant O'Hara to pay her less than others but requiring her to carry a greater workload, Dr. Harris presented testimony to the UDC Board of Trustees at its Budget and Finance Committee meeting.

97.     Among other testimony presented, Dr. Harris protested disparate salaries between new hires, who are virtually all non-African-American, and experienced current faculty, including a number of African-American professors, stating: "In terms of faculty members, we need to be treated respectfully by Administration and by the Board of Trustees. New hires with less experience than those who have been teaching at the school for four, six, ten, or more years are being brought in at higher salaries. *This is unfair and places the BOT in the position of*

*supporting a University that is open to legal action from protected groups.*"   (Emphasis added.)

98.   In or about December 2018, contrary to established UDC procedures and protocol, Defendant O'Hara decided to initiate a hiring process to hire the next Chairperson for the Department of Health, Nursing and Nutrition from outside of UDC.

99.   In response to the announcement, Dr. Harris wrote O'Hara questioning her decision and copying a number of UDC officials and the President of the Faculty Senate, stating:

> This position has been advertised as a tenure-track position. It should, therefore, be subject to the procedures that are followed for selection of faculty members. Saying this, administrators should not be part of the initial step of this process.

> This is to put you on notice that all remedies available to faculty as a part of shared governance will be used to return control of this important selection of faculty back to the faculty. I am requesting, in the meantime, you suspend the selection process that you have initiated for the position of Chairperson for the Department of Health, Nursing and Nutrition and that the current faculty of the Department of Health, Nursing and Nutrition elect our Chairperson. This elected faculty member could serve as an Interim until this issue has been resolved.

> I have copied the Chairperson of the Faculty Senate Academic Standards, Programs, and Policies Committee to this e-mail.

100.   In or about February 2019, after Dr. Oates was not selected by Dean O'Hara, Dr. Harris continued to press the issue given the hard work that she and other faculty selection committee members had put into the selection process.

101.   Dr. Harris met with Dean O'Hara, Associate Dean Elgloria Harrison (African-American) and Department Chairperson Pewen.  During that discussion, Defendant O'Hara stated that Dr. Oates was not selected because "She looks just like you, Dr. Harris."  Associate Dean Elgloria Harrison and then-Chairperson Pewen were present for the comment.  Associate

Dean Harrison looked visibly surprised that O'Hara uttered the comment, as her eyes expanded.

102.    Dr. Harris understood Defendant O'Hara's comment to be referring to her race when Dr. Harris asked, "What do you mean, looks just like me?"  Defendant O'Hara was observed to be fumbling for words to say in an apparent attempt to deflect from the off-color comment. She tried to "clean up" the comment by referring to research agendas between Dr. Harris and Dr. Oates being similar.  Dean O'Hara offered no apology for making the statement and/or otherwise offending Dr. Harris.

103.    Dr. Harris protested that explanation as not a valid reason for overturning the faculty's recommendation, "especially given that [Defendant O'Hara has] no expertise in the area of health care, practice or education."

### Dr. Harris Again Testifies Before The D.C. Council About Matters of Public Concern

104.    On or about February 28, 2019, Dr. Harris presented testimony to the D.C. Council, expressing, among other concerns, the disparate experience and salaries between new faculty hires and those of experienced UDC faculty.  She stated that "… less experienced newly-hired employees make more money than the seasoned employees who mentor them."

105.    Perhaps of greater concern was her testimony about retaliation by UDC administration, misappropriation by UDC of funds, including City and federal funds, and misuse of the term "equity imperative" as a perpetuation of serious race discrimination.  Dr. Harris testified:

> The so-called "Equity Imperative" is a myth, a fable, a fairy tale. What is equitable about allowing administrators of the University to force faculty members to put together extensive and informative annual teaching portfolios only to have these administrators disregard the principles of peer evaluation and shared governance? Administrators routinely override evaluations of faculty evaluation committees for arbitrary and capricious reasons. Often it is

20

because administrators want to deny tenure or promotion to those who express their concerns for students and faculty.

Why are administrators of this public institution allowed to treat it as a fiefdom where those who do not bow down to administrators face retaliation and harassment?

106. Again, within weeks of Dr. Harris continuing to vocally challenge the improper actions of Dean O'Hara, O'Hara lowered Dr. Harris' performance rating, again ignoring the outstanding ratings by Dr. Harris' supervisor, Acting Chairperson Elgloria Harrison and the faculty DEPC.

107. On or about April 9, 2019, Dr. Harris emailed Chief Academic Officer Lawrence Potter regarding the failed faculty search whereby Dr. Veronica Oates was denied a faculty position based on the recommendation by Defendant O'Hara.

108. After receiving a lower performance evaluation again by Dean O'Hara for the 2018-2019 academic year, Dr. Harris again appealed that decision on or about May 20, 2019.

109. In a detailed letter to Dr. Lawrence Potter, Chief Academic Officer, Dr. Harris recounted the last three performance evaluations and Defendant O'Hara's clear efforts to suppress her ratings.  These actions have continued to block Dr. Harris' effort to apply for and be promoted from Associate to Full Professor after thirteen (13) years of loyal and exemplary service to UDC, its students, its governance and its educational offerings.

110. Dr. Harris notified Defendant O'Hara on or about May 22, 2019, that she had taken steps to appeal her faculty evaluations for the last three years.

111. In or about September 15, 2019, Chief Academic Officer Potter finally responded to Dr. Harris' appeal of her lower performance evaluation.  He deferred to Defendant O'Hara, just as his predecessor did.

**COUNT I:**
**VIOLATION OF 42 U.S.C. § 1981 FOR RACE DISCRIMINATION AGAINST ALL**
**DEFENDANTS**

112.   Plaintiff realleges and incorporates by reference the prior paragraphs as if fully set forth herein.

113.   Dr. Harris has carried out her faculty responsibilities, duties and tasks with professionalism and competence with no allegations of unacceptable job performance by her immediate supervisor or the faculty DEPC.

114.   Defendant UDC has declined to pay her compensation equal to, or comparable with, her Caucasian counterparts on account of her race, where she has performed substantially similar job tasks, duties and responsibilities as other similarly situated faculty members.

115.   UDC, by and through Defendant O'Hara, has improperly suppressed Dr. Harris' performance evaluations for the last three academic years in an apparent effort to block her for promotion to Full Professor.

116.   Defendant UDC and its officials have ratified the racially discriminatory decisions to rate Dr. Harris' job performance outside of conformity with the ratings of her immediate supervisors and faculty DEPC for a given academic year.

117.   In addition, Defendants have treated Dr. Harris in a disparate manner on account of her race and national origin when compared to her non-African American counterparts by, among other ways, undermining her authority, closely scrutinizing her actions and decisions, humiliating her in front of others, and by demeaning her value and professionalism.

118.   As a result of Defendants' race discrimination against Dr. Harris, she has suffered economic damages and compensatory damages for pain, suffering, emotional anguish and damage to

her reputation, justifying an award of monetary damages to be proven at trial.

119. Plaintiff seeks immediate promotion to Full Professor to be recommended by the Chief Academic Officer and President of the University and approved by the Board of Trustees as has been the recent practice of the University for appointments by President Mason.

120. This promotion would be accompanied by back pay in the form of a salary that Dr. Harris would have received as compensation had she been promoted to Full Professor in 2017, along with all pay increases and associated fringe benefits.

121. Plaintiff also seeks reimbursement of attorneys' fees, interest and costs associated with pursuing this matter, pursuant to the federal statute.

**COUNT II:**
**VIOLATION OF 42 U.S.C. § 1981 FOR RETALIATION AGAINST ALL DEFENDANTS**

122. Plaintiff realleges and incorporates by reference the prior paragraphs as if fully set forth herein.

123. Dr. Harris has carried out her faculty responsibilities, duties and tasks with professionalism and competence with no allegations of unacceptable job performance by her immediate supervisor or the faculty DEPC.

124. In the face of animus directed towards Dr. Harris by Defendant O'Hara for protesting disparate treatment on account of her race, including but not limited to unequal pay and disparate treatment of African-American faculty and non-selection of African-American experienced faculty for leadership roles and selection of less experienced non-African American candidates, Dr. Harris has continued to be vocal about and to protest such discrimination and retaliatory behavior by Defendant administrators, including Defendant

O'Hara.

125. Dr. Harris also protested race discrimination on behalf of Dr. Barbara Harvey and testified on her behavior at her arbitration, alleging, in part, disparate treatment based on race.

126. When Dr. Harris has vocalized her concerns about race discrimination, she has been rebuffed with, among other actions, the issuance of a Letter of Counseling by her Asian-American supervisor.

127. UDC, by and through Defendant O'Hara, has taken adverse employment actions against Dr. Harris, including but not limited to (1) improperly suppressing Dr. Harris' performance evaluations for the last three academic years in an apparent effort to block her for promotion to Full Professor, (2) blocking promotions to Full Professor, (3) deciding not to appoint Dr. Harris to leadership positions within her Department or CAUSES, and (4) paying her less compensation than her similarly situated faculty members.

128. Defendant UDC and its officials have ratified these decisions to take adverse actions against Dr. Harris.

129. Dr. Harris' protected activity was in close temporal proximity to the adverse actions taken against her.   The adverse actions were as a result of that protected activity.

130. As a result of Defendants' unlawful retaliation against Dr. Harris, she has suffered economic damages and compensatory damages for pain, suffering, emotional anguish and damage to her reputation, justifying an award of monetary damages to be proven at trial.

131. Plaintiff seeks immediate promotion to Full Professor to be recommended by the Chief Academic Officer and President of the University and approved by the Board of Trustees as has been the recent practice of the University for appointments by President Mason.

132. This promotion would be accompanied by back pay in the form of a salary that Dr. Harris would have received as compensation had she been promoted to Full Professor in 2017, along with all pay increases and associated fringe benefits

133. Plaintiff also seeks reimbursement of attorneys' fees, interest and costs associated with pursuing this matter, pursuant to the federal statute.

### COUNT III:
### VIOLATION OF D.C. HUMAN RIGHTS ACT FOR RACE AND NATIONAL ORIGIN DISCRIMINATION AGAINST ALL DEFENDANTS

134. Plaintiff realleges and incorporates by reference the prior paragraphs as if fully set forth herein.

135. Defendant UDC is an "Employer" within the meaning of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.02(10), because it is a "person", as defined by the DCHRA, D.C. Code § 2-1401(21), who, for compensation, employs Dr. Harris or is "acting in the interest of" Dr. Harris' employer, directly or indirectly.

136. Defendant O'Hara is an "Employer" within the meaning of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.02(10), because it is a "person", as defined by the DCHRA, D.C. Code § 2-1401(21), who is "acting in the interest of" Dr. Harris' employer, directly or indirectly.

137. Dr. Harris has carried out her faculty responsibilities, duties and tasks with professionalism and competence with no allegations of unacceptable job performance by her immediate supervisor or the faculty DEPC.

138. UDC, by and through Defendant O'Hara, has improperly suppressed Dr. Harris' performance evaluations for the last three academic years in an effort to block her for promotion to Full

Professor.

139. Defendant UDC and its officials have ratified the racially discriminatory decisions to rate Dr. Harris' job performance in conformity with the ratings of her immediate supervisors and faculty DEPC for a given academic year.

140. In addition, Defendants have treated Dr. Harris in a disparate manner on account of her race and/or national origin when compared to her Caucasian counterparts by, among other ways, undermining her authority, closely scrutinizing her actions and decisions, humiliating her in front of others and by demeaning her value and professionalism.

141. As a result of Defendants' race and/or national origin discrimination against Dr. Harris, she has suffered economic damages and compensatory damages for pain, suffering, emotional anguish and damage to her reputation, justifying an award of monetary damages to be proven at trial.

142. Plaintiff seeks immediate promotion to Full Professor to be recommended by the Chief Academic Officer and President of the University and approved by the Board of Trustees as has been the recent practice of the University for appointments by President Mason.

143. This promotion would be accompanied by back pay in the form of a salary that Dr. Harris would have received as compensation had she been promoted to Full Professor in 2017, along with all pay increases and associated fringe benefits

144. Plaintiff also seeks reimbursement of attorneys' fees, interest and costs associated with pursuing this matter, pursuant to the D.C. statute.

**COUNT IV:**
**VIOLATION OF THE D.C. HUMAN RIGHTS ACT FOR RETALIATION AGAINST**
**ALL DEFENDANTS**

145.   Plaintiff realleges and incorporates by reference the prior paragraphs as if fully set forth herein.

146.   Defendant UDC is an "Employer" within the meaning of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.02(10), because it is a "person", as defined by the DCHRA, D.C. Code § 2-1401(21), who, for compensation, employs Dr. Harris or is "acting in the interest of" Dr. Harris' employer, directly or indirectly.

147.   Defendant O'Hara is an "Employer" within the meaning of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.02(10), because it is a "person", as defined by the DCHRA, D.C. Code § 2-1401(21), who is "acting in the interest of" Dr. Harris' employer, directly or indirectly.

148.   Dr. Harris has carried out her faculty responsibilities, duties and tasks with professionalism and competence with no allegations of unacceptable job performance by her immediate supervisor or the faculty DEPC.

149.   In the face of animus directed towards Dr. Harris by Defendant O'Hara for protesting disparate treatment on account of her race, including but not limited to unequal pay and disparate treatment of African-American faculty and non-selection of African-American experienced faculty for leadership roles and selection of less experienced white candidates, Dr. Harris has continued to be vocal about and protest such discrimination and retaliatory behavior by Defendant administrators, including Defendant O'Hara.

150.   Dr. Harris also protested race and/or national origin discrimination on behalf of Dr. Barbara

Harvey and testified on her behavior at her arbitration, alleging, in part, disparate treatment based on race and/or national origin.

151.    When Dr. Harris has vocalized her concerns about race and/or national origin discrimination, she has been rebuffed with, among other actions, the issuance of a Letter of Counseling by her supervisor.

152.    UDC, by and through Defendant O'Hara, has taken adverse employment actions against Dr. Harris, including but not limited to (1) improperly suppressing Dr. Harris' performance evaluations for the last three academic years in an effort to block her for promotion to Full Professor, (2) blocking promotion to Full Professor, and (3) deciding not to appoint Dr. Harris to leadership positions within her Department or CAUSES.

153.    Defendant UDC and its officials have ratified these decisions to take adverse actions against Dr. Harris.

154.    Dr. Harris' protected activity was in close temporal proximity to the adverse actions taken against her.   The adverse actions were as a result of that protected activity.

155.    As a result of Defendants' unlawful retaliation against Dr. Harris, she has suffered economic damages and compensatory damages for pain, suffering, emotional anguish and damage to her reputation, justifying an award of monetary damages to be proven at trial.

156.    Plaintiff seeks immediate promotion to Full Professor to be recommended by the Chief Academic Officer and President of the University and approved by the Board of Trustees as has been the recent practice of the University for appointments by President Mason.

157.    This promotion would be accompanied by back pay in the form of a salary that Dr. Harris would have received as compensation had she been promoted to Full Professor in 2017, along

with all pay increases and associated fringe benefits

158.   Plaintiff also seeks reimbursement of attorneys' fees, interest and costs associated with pursuing this matter, pursuant to the D.C. statute.

**COUNT V:**
**VIOLATION OF FIRST AMENDMENT TO U.S. CONSTITUTION AGAINST**
**DEFENDANT UDC FOR SPEAKING OUT ON MATTERS OF PUBLIC CONCERN**

159.   Plaintiff realleges and incorporates by reference the prior paragraphs as if fully set forth herein.

160.   Dr. Harris has carried out her faculty responsibilities, duties and tasks with professionalism and competence with no allegations of unacceptable job performance by her immediate supervisor or the faculty DEPC.

161.   Dr. Harris has spoken out on matters of public concern to USDA evaluators, UDC's Board of Trustees and the D.C. Council regarding, among other topics, misappropriation of land grant funds at UDC, union busting by the UDC by taking actions that undercut shared governance with faculty, unequal pay and disparate treatment of faculty and non-selection of African-American experienced faculty for leadership roles and selection of less experienced white candidates.

162.   Dr. Harris has voiced her concerns in her capacity as a public institution faculty member and private citizen and native of the District of Columbia concerned about the welfare of its citizens and students of UDC.

163.   When Dr. Harris has vocalized her concerns, she has been rebuffed with, among other actions, the issuance of a Letter of Counseling by her supervisor.

164.   As result of Dr. Harris' protected First Amendment speech, Defendant UDC, by and through

Defendant O'Hara, has taken adverse employment actions against Dr. Harris, including but not limited to (1) improperly suppressing Dr. Harris' performance evaluations for the last three academic years in an apparent effort to block her for promotion to Full Professor, (2) blocking promotions to Full Professor, (3) deciding not to appoint Dr. Harris to leadership positions within her Department or CAUSES, and (4) paying her less compensation than her similarly situated faculty members.

165.    Defendant UDC and its officials have ratified these decisions to take adverse actions against Dr. Harris.

166.    Dr. Harris' protected speech was a substantial or motivating factor in prompting the retaliatory or punitive act or prohibited personnel actions taken against her.

167.    Defendant UDC would not have taken the personnel actions against her absent her protected speech.

168.    As a result of Defendant UDC's unlawful retaliation against Dr. Harris, she has suffered economic damages and compensatory damages for pain, suffering, emotional anguish and damage to her reputation, justifying an award of monetary damages to be proven at trial.

169.    Plaintiff seeks immediate promotion to Full Professor to be recommended by the Chief Academic Officer and President of the University and approved by the Board of Trustees as has been the recent practice of the University for appointments by President Mason.

170.    This promotion would be accompanied by back pay in the form of a salary that Dr. Harris would have received as compensation had she been promoted to Full Professor in 2017, along with all pay increases and associated fringe benefits

171.    Plaintiff also seeks reimbursement of attorneys' fees, interest and costs associated with

pursuing this matter, pursuant to the federal statute.

**COUNT VI:**
**ACTION FOR RETALIATION AGAINST DEFENDANT UDC IN VIOLATION OF**
**THE D.C. WHISTLEBLOWER PROTECTION ACT, D.C. CODE § 1-615.51 *ET SEQ.***

172.    Plaintiff realleges and incorporates by reference the prior paragraphs as if fully set forth herein.

173.    Dr. Harris has carried out her faculty responsibilities, duties and tasks with professionalism and competence with no allegations of unacceptable job performance by her immediate supervisor or the faculty DEPC.

174.    Dr. Harris has made protected disclosures to USDA evaluators, UDC's Board of Trustees and the D.C. Council regarding, among other topics, misappropriation of land grant funds at UDC, union busting by the UDC by taking actions that undercut shared governance with faculty, unequal pay and disparate treatment of faculty and non-selection of African-American experienced faculty for leadership roles and selection of less experienced white candidates.

175.    Dr. Harris has made protected disclosures in her capacity as a UDC faculty member concerned about the welfare of D.C. citizens and students of UDC.

176.    Dr. Harris had a good faith belief that her protected disclosures evidence gross mismanagement by UDC, gross misuse or waste of public resources or funds, abuse of authority in connection with the administration of the land grant programs of CAUSES or execution of the USDA land grant contract with UDC, and/or violated a federal or District of Columbia law, rule or regulation or terms of the contract between the District (UDC) and the USDA.

177.  When Dr. Harris has vocalized her concerns, she has been rebuffed with, among other actions, the issuance of a Letter of Counseling by her supervisor.

178.  Defendant UDC, by and through O'Hara and other UDC officials, retaliated or took or threatened to take prohibited personnel actions against Dr. Harris, including but not limited to (1) improperly giving Dr. Harris' low performance evaluations for the last three academic years in an apparent effort to block her for promotion to Full Professor, (2) blocking promotions to Full Professor, (3) deciding not to appoint Dr. Harris to leadership positions within her Department or CAUSES, and (4) paying her less compensation than her similarly situated faculty members.

179.  Defendant UDC and its officials have ratified these decisions to take adverse actions against Dr. Harris.

180.  Dr. Harris' protected disclosures were a contributing factor to the retaliation or prohibited personnel actions taken against her.

181.  As a result of Defendant UDC's unlawful retaliation against Dr. Harris, she has suffered economic damages and compensatory damages for pain, suffering, emotional anguish and damage to her reputation, justifying an award of monetary damages to be proven at trial.

182.  Plaintiff seeks immediate promotion to Full Professor to be recommended by the Chief Academic Officer and President of the University and approved by the Board of Trustees as has been the recent practice of the University for appointments by President Mason.

183.  This promotion would be accompanied by back pay in the form of a salary that Dr. Harris would have received as compensation had she been promoted to Full Professor in 2017, along with all pay increases and associated fringe benefits

184. Plaintiff also seeks reimbursement of attorneys' fees, interest and costs associated with pursuing this matter, pursuant to the federal statute.

**COUNT VII:**
**ACTION FOR RETALIATION  IN VIOLATION OF FALSE CLAIMS ACT,**
**31 U.S.C. § 3730(H)**

185. Plaintiff realleges and incorporates by reference the prior paragraphs as if fully set forth herein.

186. Dr. Harris has carried out her faculty responsibilities, duties and tasks with professionalism and competence with no allegations of unacceptable job performance by her immediate supervisor or the faculty DEPC.

187. Dr. Harris has made protected disclosures to USDA evaluators, UDC's Board of Trustees and the D.C. Council regarding, among other topics, misappropriation of land grant funds at UDC in violation of the contract between USDA and UDC

188. Dr. Harris had a good faith belief that her protected disclosures evidenced gross mismanagement by UDC, gross misuse or waste of public resources or funds, abuse of authority in connection with the administration of the land grant programs of CAUSES or execution of the USDA land grant contract with UDC, and/or violated a federal or District of Columbia law, rule or regulation or terms of the contract between the District (UDC) and the USDA.

189. Defendant UDC, through its managers, including but not limited to Defendant O'Hara, had knowledge that Dr. Harris had engaged in protected activity.

190. Defendant UDC, through its managers, including but not limited to Defendant O'Hara, retaliated and/or took prohibited personnel actions against Dr. Harris, including but not

limited to (1) improperly giving Dr. Harris' low performance evaluations for the last three academic years in an apparent effort to block her for promotion to Full Professor, (2) blocking promotions to Full Professor, (3) deciding not to appoint Dr. Harris to leadership positions within her Department or CAUSES, and (4) paying her less compensation than her similarly situated faculty members.

191.   Defendant UDC and its officials have ratified these decisions to take adverse actions against Dr. Harris.

192.   Defendant UDC's retaliation against Dr. Harris was motivated, at least in part, by her engaging in protected activity under the False Claims Act.

193.   As a result of Defendants' unlawful retaliation against Dr. Harris, she has suffered economic damages and compensatory damages for pain, suffering, emotional anguish and damage to her reputation, justifying an award of monetary damages to be proven at trial.

194.   Pursuant to 31 U.S.C. § 3730(h)(2), Dr. Harris also seeks two (2) times her economic damages, interest on those economic damages, and compensation for any special damages sustained as a result of the discrimination held unlawful under the False Claims Act.

195.   Plaintiff seeks immediate promotion to Full Professor to be recommended by the Chief Academic Officer and President of the University and approved by the Board of Trustees as has been the recent practice of the University for appointments by President Mason.

196.   This promotion would be accompanied by back pay in the form of a salary that Dr. Harris would have received as compensation had she been promoted to Full Professor in 2017, along with all pay increases and associated fringe benefits

197.   Plaintiff also seeks reimbursement of attorneys' fees, interest and costs associated with

pursuing this matter, pursuant to the federal statute.

## **PRAYER FOR RELIEF**

198.     WHEREFORE, Plaintiff respectfully requests that this Court:

A.     Declare the Defendants' conduct of committing race discrimination and/or retaliation against Plaintiff B. Michelle Harris to be in violation of 42 U.S.C. § 1981

B.     Declare the Defendants' conduct of committing race and/or national origin discrimination and/or retaliation against Plaintiff Harris to be in violation of the D.C. Human Rights Act;

C.     Declare the Defendant UDC's conduct of retaliating against Plaintiff Harris for speaking out on matters of public concern by, among other ways, (1) improperly giving Dr. Harris' low performance evaluations for the last three academic years in an apparent effort to block her for promotion to Full Professor, (2) blocking promotions to Full Professor, (3) deciding not to appoint Dr. Harris to leadership positions within her Department or CAUSES, and (4) paying her less compensation than her similarly situated faculty members., violates the First Amendment to the U.S. Constitution;

D.     Declare the Defendant UDC's conduct of retaliating against Plaintiff Harris for speaking out about misappropriation of federal land grant funds by UDC by, among other ways, (1) improperly giving Dr. Harris' low performance evaluations for the last three academic years in an apparent effort to block her for promotion to Full Professor, (2) blocking promotions to Full Professor, (3) deciding not to appoint Dr. Harris to leadership positions within her Department or CAUSES, and (4) paying her

less compensation than her similarly situated faculty members., violates the False Claims Act, 31 U.S.C. § 3730(h);

E.      Declare the Defendant UDC's conduct of retaliating against Plaintiff Harris for protected disclosures by, among other ways, (1) improperly giving Dr. Harris' low performance evaluations for the last three academic years in an apparent effort to block her for promotion to Full Professor, (2) blocking promotions to Full Professor, (3) deciding not to appoint Dr. Harris to leadership positions within her Department or CAUSES, and (4) paying her less compensation than her similarly situated faculty members., violates the D.C Whistleblower Protection Act;

F.      Enjoin Defendants to comply with the aforementioned federal and state laws;

G.      Award to Plaintiff her unpaid wages against all Defendants, including but not limited to the salary and benefits compared to her similarly situated faculty members, plus double damages of an equal amount under the False Claims Act;

H.      Grant Plaintiff immediate promotion to Full Professor with salary commensurate to where it would have been had her opportunity to apply for promotion been granted in 2017, along with all pay increases and associated fringe benefits;

I.      Grant Plaintiff additional compensation from June 2017 to the date of award at trial, given that individuals who are Associate Professors who serve in leadership positions in their programs and departments receive additional compensation compared to those who do not hold such leadership positions;

J.      Award to Plaintiff compensatory damages for emotional distress, anguish and pain and suffering in an amount to be determined at trial;

K.      Award to Plaintiff her costs and reasonable attorneys' fees incurred in this action;

L.      Award Plaintiff prejudgment and post-judgment interest as permitted by law; and

M.      Grant such other and further relief as the Court deems just and proper.

Dated: September 27, 2019                    Respectfully submitted,

                                             **KALBIAN HAGERTY, LLP**


                                             By __/s/ Eric L. Siegel_____
                                             Eric L. Siegel (Bar No. 427350)
                                             esiegel@kalbianhagerty.com
                                             Evan M. Lisull (Bar No. 1023596)
                                             elisull@kalbianhagerty.com
                                             888 17th Street, N.W., Suite 1000
                                             Washington, D.C. 20006
                                             (202) 223-5600 (Office)
                                             (202) 223-6625 (Facsimile)

                                             *Attorney for Plaintiff B. Michelle Harris*

                          **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff B. Michelle Harris respectfully demands a trial by jury.

                                             ___/s/ Eric L. Siegel_____
                                             Eric L. Siegel