UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

B. MICHELLE HARRIS,

                Plaintiff,

        v.                                          Case No. 1:19-cv-02915 (TNM)

TRUSTEES OF THE UNIVERSITY OF
THE DISTRICT OF COLUMBIA, *et al.*,

                Defendants.

## MEMORANDUM OPINION

This case concerns a long-running feud between a college professor and her dean.  Dr. Michelle Harris sues her employer, the University of the District of Columbia ("UDC"), claiming that her boss repeatedly retaliated against her for speaking out about racial discrimination, financial mismanagement, and bureaucratic failures at the school.  Defendants UDC and Dean Sabine O'Hara (collectively, "the University") deny the allegations and move for summary judgment.

Harris lacks any viable claims.  Several are legally insufficient or conceded.  And she otherwise fails to present evidence creating a triable issue on the retaliation that she allegedly faced for whistleblowing.  The Court will therefore grant the University's motion.

## I.  BACKGROUND

UDC is a historically black public university in Washington, D.C.  *See* Defs.' Am. Statement of Undisputed Material Facts ("Defs.' SUMF") ¶ 3, ECF No. 34.[1]  Harris, an African

---

[1]  All exhibit numbers refer to the numbered attachments to the CM/ECF filings, not the title of any documents.  All page citations refer to the pagination generated by the Court's CM/ECF system.  Unless otherwise stated, Plaintiff admits the University's facts as undisputed.  *See generally* Pl.'s Statement of Material Facts in Genuine Dispute ("Pl.'s SOMF"), ECF No. 36-2.

American, began her career at UDC in 2006 as an Assistant Professor in the nutrition and dietetics program.  *Id.* ¶¶ 1, 7, 17.  Four years later, UDC founded its College of Agriculture, Urban Sustainability, and Environmental Sciences ("CAUSES") as the University's landgrant college.  *Id.* ¶ 9.  CAUSES has two halves:  the landgrant side—funded by U.S. Department of Agriculture ("USDA") grant money—and the academic side.  *Id.* ¶¶ 10–11.  UDC folded Harris's nutrition and dietetics program into CAUSES, and eventually moved it under the Department of Health, Nursing, and Nutrition ("HNN") on the academic side.  *Id.* ¶¶ 23–24.  Harris viewed herself as the "custodian" of the nutrition and dietetics program, *id.* ¶ 223, which was one of three disciplines in HNN, *id.* ¶ 52.

UDC appointed Sabine O'Hara as the Dean of CAUSES and Director of Landgrant Programs in March 2012.  *Id.* ¶ 14.  O'Hara is Caucasian and a U.S. citizen who immigrated here from Germany.  *Id.* ¶ 2.

The relationship between O'Hara and Harris got off to a rocky start.  Several months after O'Hara arrived, Harris wrote to the Secretary of the USDA on official UDC letterhead to report funding issues at the school.  *Id.* ¶¶ 27, 30.  The letter implored the Secretary to identify new funding sources for her students and requested a meeting on a litany of topics, including "structural issues" on campus.  Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") Ex. 12 at 2–4, ECF No. 36-12.  O'Hara met with Harris and admonished her for bypassing proper UDC channels to contact USDA directly.  Defs.' SUMF ¶¶ 30–31.  Harris recalls that in that meeting O'Hara said that Harris "lacked social intelligence"—a statement O'Hara denies making.  Pl.'s SOMF at 11; Pl.'s Opp'n Ex. 7 at 15, ECF No. 36-7.  Harris also claims O'Hara told her that "if an administrative or managerial position came up," she "would not get it."  Pl.'s SOMF at 11.

Despite the rebuke, O'Hara recommended Harris for promotion to Associate Professor less than a year later.  Defs.' SUMF ¶ 33.  In her memorandum in support of the promotion, O'Hara noted Harris's "active research agenda" despite "extraordinary demands" on her time.  Pl.'s Opp'n Ex. 13 at 2, ECF No. 36-13.  She also stated:  "Dr. Harris understands that more of her time will have to be devoted to publishing her research results."  *Id.*

Harris and O'Hara's relationship deteriorated from that modest high point.  Beginning in 2014, O'Hara reported Harris to Human Resources several times for what she viewed as "hostile or unprofessional" behavior.  Defs.' SUMF ¶ 39.  One report followed an argument in which Harris told O'Hara not to treat her like a "lackey" and warned "this is not a plantation" before storming away.  Pl.'s Opp'n Ex. 7 at 24–25, ECF No. 36-7; *see also* Pl.'s SOMF at 86.  Harris, on the other hand, viewed O'Hara's HR reports as a campaign of harassment.  Defs.' SUMF ¶ 40.  And she claims that over the years O'Hara sometimes excluded her from meetings and exhibited dismissive behavior.  *See* Pl.'s Opp'n at 47–50, ECF No. 36 (citing Pl.'s Opp'n Ex. 25 ¶¶ 8–10, ECF No. 36-25).

Harris accordingly filed an Equal Employment Opportunity complaint in June 2015 alleging racial discrimination.  Defs.' SUMF ¶ 253.  O'Hara learned of the charge later that year—and no later than December 2015.  *Id.* ¶¶ 255–58; *see also* Pl.'s Opp'n Ex. 21 at 5, ECF No. 36-21.  The D.C. Office of Human Rights ultimately dismissed the complaint in 2017.[2]

Beyond these personal interactions, the two academics clashed over university management too.  For several years, UDC directed landgrant faculty to teach some courses in

---

[2]  Harris and UDC personnel other than O'Hara met for a mediation in July 2016.  Compl. ¶ 32, ECF No. 1; Defs.' SUMF ¶ 268.  The D.C. Office of Human Rights dismissed Harris's claims in May 2017, Defs.' SUMF ¶ 261, concluding that she "fail[ed] to state claim for which relief can be granted," *id.* Ex. 18 at 72, ECF No. 34-18.

Harris's program and in other academic disciplines in CAUSES.  Defs.' SUMF ¶ 225.  Harris, who held various executive positions in the UDC faculty union, repeatedly referred to the use of non-regular faculty in her department as "union-busting."[3]  *Id.* ¶¶ 77, 226, 239.  And she spoke out vociferously against this and other staffing practices.  *Id.* ¶¶ 226–47.  For example, at a UDC Board of Trustees meeting in December 2016, Harris questioned CAUSES's spending practices and how it used adjunct faculty.  *Id.* ¶¶ 269–270.  She also testified that non-tenure-track instructors were improperly "labeled as adjunct faculty."  *Id.*; Defs.' SUMF Ex. 19 at 7–10, ECF No. 34-19.

According to Harris, she took her complaints directly to USDA personnel too.  She approached a USDA evaluator in February 2017 when USDA representatives visited the school for a planned site visit.  Pl.'s SOMF at 84–85.  Harris recounted the school's "misappropriation" of federal funds and expressed concern that mismanagement would deplete resources dedicated to District residents.  *Id.*; *see also* Pl.'s Opp'n Ex. 9 at 24–29, ECF No. 36-9.  The "alarmed" USDA evaluator shared that she might have to report the claims to USDA leadership.  Pl.'s Opp'n Ex. 9 at 27, ECF No. 36-9.  Harris alleges that O'Hara lingered nearby, "eavesdropping" on this two- or three-minute conversation.  *Id.* at 25.

Tensions escalated later that summer when three professors in the nutrition and dietetics program abruptly left UDC, including Dr. Prema Ganganna, the HNN department chair.  Defs.' SUMF ¶ 48.  This triggered "an urgent staffing situation."  *Id.*  O'Hara decided on a short-term solution:  relying on visiting professors that year while searching for long-term replacements.  *Id.* ¶ 49.  O'Hara convened a faculty search committee and appointed a professor other than Harris

---

[3]  UDC and the UDCFA (the faculty union) negotiate Master Agreements to govern compensation and employment terms, but those terms do not extend to visiting, adjunct, or landgrant faculty.  *Id.* ¶¶ 82–84.

as the representative from the nutrition and dietetics program.  *Id.* ¶ 53.  O'Hara had assigned Harris to serve as the chair or as a member of faculty search committees on multiple prior occasions.  *Id.* ¶ 58.

Even with the stopgap hires, Harris had to teach extra courses during the 2017–18 academic year.  Pl.'s Opp'n Ex. 8 ¶ 16, ECF No. 36-8.  She claims that she protested the "teaching overload" to O'Hara, who refused to increase her compensation or lighten the burden through yet more hiring.  *Id.* ¶ 17.  O'Hara also declined to immediately appoint Harris as director of the didactic program in dietetics ("DPD"), a role vacated by Ganganna.  Pl.'s Opp'n Ex. 7 at 103–08, ECF No. 36-7.  O'Hara instead appointed a visiting professor, Nancy Chapman, to that role.  Defs.' SUMF ¶¶ 68–70.  After Chapman's one-year visiting appointment ended, O'Hara appointed Harris as DPD Director in September 2018.  *Id.* ¶ 71.

Harris's clashes with UDC administrators continued.  In June 2018, Harris sent a memo to the chair of UDC's Board of Trustees to oppose a new Ph.D. program in Urban Leadership and Entrepreneurship as a waste of resources.  *Id.* ¶ 273.  That September, she testified at a meeting of the Board's Audit, Budget, and Finance Committee to question tuition, fees, services, and faculty salaries.  *Id.* ¶¶ 273–76; *see id.* Ex. 19 at 18–21, ECF No. 34-19.  Most recently, Harris testified before the D.C. Council in February 2019, when she criticized UDC's "equity imperative" and treatment of professors.  Defs.' SUMF ¶ 277–79.[4]

At the core of this dispute are Harris's annual evaluations.  During this period, the Faculty Evaluation Process adhered to the procedures set forth in Article XV of the Seventh Master Agreement between UDC and its full-time faculty.  Defs.' SUMF ¶¶ 103, 106–16.

---

[4]  *See* Council of the District of Columbia, *Committee of the Whole, Performance Oversight Hearing* (Feb. 28, 2019), http://dc.granicus.com/MediaPlayer.php?view_id=2&clip_id=4904 (speech at 38:00; questions at 53:00).

Faculty received scores in teaching effectiveness, service, and scholarship.  *Id.* ¶ 105.  There were five possible scores:  Distinguished (4.0), Outstanding (3.0), Meets Expectations (2.0), Needs Improvement (1.0), and Does Not Meet Professional Standards (0.0).  *Id.* ¶ 114.  A faculty member had to achieve certain high composite ratings—a weighted combination of all three categories—in consecutive years to be eligible for promotion.  *Id.* ¶¶ 200, 202–03.  Although each year a faculty member received independent reviews from her department chair, a committee of her peers, and the dean, the rating by the dean served as the definitive rating.  *Id.* ¶ 201.  A faculty member could appeal this final rating.  *Id.* ¶ 109.

For the three academic years covering 2016–19, O'Hara gave Harris low ratings in "scholarship."  *Id.* ¶¶ 149, 172; *see* Defs.' SUMF Ex. 2 at 32–37, ECF No. 34-2 (including two "Improvement Needed" ratings and one "Does Not Meet Professional Standards").  These ratings kept Harris's composite rating below the promotion threshold.  *See* Defs.' SUMF ¶¶ 146, 162, 173, 200–03.  And her composite ratings all three years were lower than her ratings from her peers and department chair.  *Id.* ¶¶ 147, 163, 173.

The main sticking point was what Harris saw as O'Hara's "narrow" definition of scholarship.  *Id.* ¶ 194.  O'Hara repeatedly emphasized publishing peer-reviewed articles.  *Id.*; *see also* Defs.' SUMF Ex. 2 at 33–37, ECF No. 34-2.  Harris protested that O'Hara's definition ignored other legitimate scholarly activities, such as writing for non-peer-reviewed publications and assisting students with their scholarship.  *See* Defs.' SUMF ¶ 194.  And Harris complained that her teaching workload hindered her research and writing capacity.  *Id.*

Harris twice appealed her evaluations.  *Id.* ¶ 193.  Both appeals failed.  Dr. Carl Moore, the Assistant Chief Academic Officer, handled Harris's fall 2017 appeal of her 2016–17 evaluation.  *Id.* ¶¶ 189–90.  He rejected O'Hara's appeal as untimely.  Pl.'s SOMF at 94–95; *see*

*also* Pl.'s Opp'n Ex. 18 at 2, ECF No. 36-18.  Shortly after UDC hired a new Chief Academic

Officer, Dr. Lawrence Potter, in 2019, Harris appealed to him all three years of evaluations.

Defs.' SUMF ¶¶ 193–94.  Potter and Moore independently reviewed the evaluations and upheld

O'Hara's ratings.  *Id.* ¶¶ 195–97.  Potter concurred with O'Hara's ratings in part because Harris

produced no peer-reviewed scholarly publications in the 2018–19 year despite stating in a prior

self-assessment that she would.  *Id.* ¶ 197; *see also* Defs.' SUMF Ex. 7 at 6–7, ECF No. 34-7.

Harris sued in 2019.[5]  She alleged racial discrimination, national origin discrimination,

and retaliation in violation of the Constitution, federal law, and several D.C. statutes.  Compl.

¶¶ 112–97, ECF No. 1.  She has since pared down her claims.[6]  At issue now are solely her

claims that O'Hara retaliated against her for speaking out on various fronts.  The University

moves for summary judgment, and its motion is ripe.[7]

## II.  LEGAL STANDARDS

Summary judgment is appropriate if "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is

material if it "might affect the outcome of the suit under the governing law," and a dispute is

genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When evidence conflicts,

---

[5]  Harris first sued on related grounds in 2017.  *See Harris v. Board of Trustees of the University of the District of Columbia*, 1:17-cv-02753-TNM (D.D.C.).  She later dismissed that case after repeatedly missing filing and discovery deadlines.

[6]  Harris agreed to dismiss Counts I, III, and VI in her summary judgment briefing.  *See* Pl.'s Opp'n at 11–12, 35 n.21.  So the Court will dismiss these claims and not address them further.

[7]  This Court has subject matter jurisdiction over the constitutional and federal law claims under the federal question statute, 28 U.S.C. § 1331.  It has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a).

courts must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006).

The movant bears the initial burden of identifying those portions of the record that show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once completed, the other party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (cleaned up). Unsupported allegations or mere denials in the pleadings are not enough. *See* Fed. R. Civ. P. 56(c). Similarly, because the nonmovant must supply evidence that, if true, would allow a reasonable jury to find in her favor, a "mere . . . scintilla of evidence in support of" the nonmovant's position cannot defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252. And if the nonmovant's evidence "is merely colorable, or is not significantly probative," the Court may grant summary judgment. *Id.* at 249–50 (cleaned up).

## III. ANALYSIS

Because Harris agreed to dismiss her claims of race discrimination and national origin discrimination, this case is now all about O'Hara's alleged retaliation for Harris's whistleblowing. Harris claims unlawful retaliation under (1) 42 U.S.C. § 1981 (Count II), (2) the D.C. Human Rights Act ("DCHRA") (Count IV), (3) the First Amendment (Count V), and (4) the False Claims Act (Count VII). The Court considers each in turn.

### A. Retaliation for Reporting Racial Discrimination (Counts II and IV)[8]

We start with Counts II (retaliation under 42 U.S.C. § 1981) and IV (retaliation under the DCHRA). They rise and fall together.

---

[8] Query whether Harris may proceed on her claim under Section 1981 against UDC, which she identifies as an "agency of the District of Columbia government." Compl. ¶ 5. *See Jett v. Dallas Indep. Sch. District*, 491 U.S. 701, 735 (1989) (holding that Section 1981 did not create private

Harris alleges that O'Hara retaliated against her for protesting racial discrimination. Compl. ¶¶ 122–33.  As with discrimination claims, the familiar *McDonnell Douglas* burden-shifting framework governs.  *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The framework has three parts.

The plaintiff first must establish a prima facie case.  *Jones*, 557 F.3d at 677.  To state a retaliation claim under 42 U.S.C. § 1981, an employee must show (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two.  *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015).  The standard for retaliation under the DCHRA is identical.  *Carney v. Am. Univ.*, 151 F.3d 1090, 1095 (D.C. Cir. 1998); *see also Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994) (articulating standard for DCHRA claims).

Next, "[i]f the plaintiff establishes a prima facie case, the burden shifts to the employer to produce" a "legitimate, non-retaliatory explanation" for its actions.  *Jones*, 557 F.3d at 677–78; *see also Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019) ("clarify[ing] the requirements for an adequate evidentiary proffer by the employer" (cleaned up)).

Finally, if the employer produces that evidence, the burden swings back.  To survive summary judgment, the plaintiff must show that the reasons offered by her employer were not its

---

right of action against municipal defendants); *Bouknight v. District of Columbia*, 109 F. Supp. 3d 244, 247 (D.D.C. 2015) (confirming that amendments to statute since *Jett* did not change result). But given that the University failed to raise this defense, the Court need not address it.  *See Am. Inst. of Certified Pub. Accts. v. IRS,* 804 F.3d 1193, 1199 (D.C. Cir. 2015) (explaining that parties forfeit non-jurisdictional defenses not raised to district court); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (holding that presence or absence of cause of action does not implicate subject matter jurisdiction).  And Harris's Section 1981 claims fail for other reasons.

true reasons and instead were pretextual.  *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016).

That said, once the employer asserts a non-retaliatory explanation supported by evidence, "the question whether the employee actually made out a prima facie case is no longer relevant." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (Kavanaugh, J.) (cleaned up).  So a court proceeds to the ultimate question:  whether the employee has produced enough evidence for a reasonable jury to find that the employer's explanation was not the actual basis for its actions and that retaliation was the real reason.  *Id.* at 494.  "Of course, consideration of this question requires [the court] to evaluate all of the evidence before [it], including the same evidence that a plaintiff would use to establish her prima facie case."  *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005); *accord Gonda v. Donahoe*, 79 F. Supp. 3d 284, 294 (D.D.C. 2015) ("In answering the ultimate question, the prima facie case remains relevant, but only as part of the evidence the court considers.").

Harris raises several actions by O'Hara that she claims were retaliatory:  (1) depressing her performance evaluations for academic years 2016–17, 2017–18, and 2018–19; (2) declining to appoint her to "leadership positions," (3) "overloading" her with teaching duties without appropriate compensation, and (4) "otherwise creating a retaliatory hostile work environment."  Pl.'s Opp'n at 45.  As explained below, none of these alleged adverse actions support a triable claim.

### 1.  The Performance Evaluations

Most important are Harris's performance evaluations.  She alleges that O'Hara "improperly suppress[ed]" her "performance evaluations for the last three academic years in an apparent effort to block her for promotion" from Associate Professor to Full Professor.  Compl. ¶ 127.  The promotion would include "a substantial increase in salary."  *Id.* ¶ 56.

For a "performance evaluation to be materially adverse, it must affect the employee's position, grade level, salary, or promotion opportunities." *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (cleaned up).  The University never contests that Harris's evaluation scores blocked her eligibility for promotion or that the harm was too tenuous.  Mindful that adverse actions "in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim," *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008), the Court assumes that Harris's performance evaluations were materially adverse actions.

The Court will consider the University's proffered reasons for the evaluations, followed by Harris's response.

### a.  The University's Explanation

Recall that annual performance evaluations—handed down at the end of the academic year—were a composite of ratings in three areas:  teaching effectiveness, scholarship, and service.  Defs.' SUMF ¶ 105.  Harris received these scores from O'Hara:

- 2016–17:  Composite Rating of 2.8
  - Teaching:  Outstanding (3.0)
  - Scholarship:  Improvement Needed (1.0)
  - Service:  Meets Expectations (2.0)
- 2017–18:  Composite Rating of 1.9
  - Teaching:  Meets Expectations (2.0)
  - Scholarship:  Improvement Needed (1.0)
  - Service:  Meets Expectations (2.0)
- 2018–19:  Composite Rating of 2.4
  - Teaching:  Outstanding (4.0)
  - Scholarship:  Does Not Meet Professional Standards (0.0)
  - Service:  Outstanding (4.0)

*Id.* ¶¶ 146–50; 162, 172; *id.* Ex. 2 at 32–37, ECF No. 34-2.  Each rating was not weighted evenly for purposes of the composite score because at the beginning of the year professors would select the weight given each category.[9]  Defs.' SUMF ¶ 106.

Harris challenges several ratings.  Start with Scholarship.  The University's explanation is straightforward:  There was no improper "suppression."  Defs.' Am. Mem. of P. & A. ("Defs.' Mem.") at 21–33, ECF No. 35.  O'Hara expected professors to produce published scholarly writing, and Harris repeatedly failed to do so.  And on this point the record is not limited to O'Hara's retrospective testimony; it includes her contemporaneous explanations for each rating. *See, e.g.*, *id.* at 22–35.

In April 2017, O'Hara completed her review of Harris for the 2016–17 academic year. Her justification for the "Needs Improvement" rating in Scholarship spanned seven sentences. Defs.' SUMF Ex. 2 at 37, ECF No. 34-2.  She praised Harris's "active research objectives for her students" and "professional development activities" but then noted:

> Regrettably, there is no evidence how her professional development activities translate into an active research agenda.  Dr. Harris does not list any abstracts submitted, articles under review, book chapters submitted, comparative research assessing the effectiveness of different teaching methods, grants submitted or any other active scholarship that build on her professional activities.  Given her record of professional activities I urge Dr. Harris to develop an active research focus.  Building on her community partnerships and on her student engagement strategies [for] teaching seem to be promising starting points for developing her active research focus.
>
> *Id.*

---

[9]  Under the Seventh Master Agreement between UDC and its faculty, professors such as Harris could choose Teaching to count for 50–70% of the composite score, Scholarship 20–40%, and Service 10–20%.  *See id.* Ex. 5 at 31, ECF No. 34-5.

The rating and results were similar for the 2017–18 year.  O'Hara again awarded a "Needs Improvement" rating in Scholarship and again emphasized Harris's lack of tangible scholarship.  *Id.* at 36.  Even more to the point this year, O'Hara explained:

> Dr. Harris did not provide any evidence of active scholarship.  Attending professional meetings and engaging her students in participatory research does not constitute evidence of active research.  I urge Dr. Harris to consult the CAUSES faculty handbook for a list of scholarly activities.  Since she engaged her students in research she might consider conducting research on the effectiveness of her assignments . . .  Such a research project would lend itself for presentation at professional conferences and for publication in a range of journals focused on nutrition education and undergraduate research.

*Id.*  This reaction tracked O'Hara's separate review of Harris's self-assessment for that year.  O'Hara lamented that in the self-assessment "evidence of scholarly activities is missing" and "clarification is also needed regarding what constitutes scholarship versus service."  *Id.*

For the 2018–19 year, O'Hara awarded Harris the bottom score in Scholarship:  "Does Not Meet Professional Standards."  *Id.* at 32.  In a cover letter, O'Hara attached all three years of evaluations "to provide further context for" the scores and remarked that it was "disappointing that [her] feedback ha[d] not resulted in any improvement."  *Id.*  She also provided a narrative:

> Dr. Harris did not provide any evidence of active scholarship.  Attending professional meetings and engaging her students in participatory research does not constitute evidence of active scholarship.  I am aware that Dr. Harris has been engaged in a collaborative research project on the exercise needs and habits of older adults. . . . Dr. Harris does not provide any evidence of her engagement in this collaborative project in her portfolio, nor does she offer a statement of scholarly objectives that would inform the evaluators of her current or planned activities as a member of the community of scholars.  Her most recent article was published in 2013, and she provides no evidence of a current research agenda, of scholarly interests and work in progress, or of presenting her current work at a professional conference.  She therefore falls short of her own stated goal of "publication of at least one article or abstract in a peer-reviewed journal."

*Id.* at 34–35.

For further support, the University points to Article XV of the Seventh Master Agreement, which governed the rating system.  O'Hara's scoring tracks the definition and

requirements of Scholarship.  *See* Defs.' Mem. at 25–27; *see also* Defs.' SUMF Ex. 5 at 34, ECF No. 34-5.  And drawing from a legion of undisputed comparator evidence, *see* Defs.' SUMF ¶¶ 123–88, the University asserts that O'Hara's evaluations of other professors exhibit similar expectations and scoring.

The Court will avoid pouring the record into this opinion, but two examples are illustrative.  Take "HNN Professor 2," a peer professor in Harris's department.[10]  O'Hara gave HNN Professor 2 a composite rating of 2.5 for 2016–17, even though she received a 3.925 and 4.0 from her peers and department chair, respectively.  *Id.* ¶¶ 123–88.  As with Harris, the culprit was a lower, "Improvement Needed" rating in Scholarship.  And the explanation was similar in that O'Hara emphasized the lack of *published* scholarship.[11]  By 2019, HNN Professor 2's Scholarship rating fell to a "Does Not Meet Professional Standards," just like Harris's.  Defs.' SUMF Ex. 3 at 4, ECF No. 34-3.  O'Hara rejected that professor's contribution to a nursing newsletter as not an article published in "a peer reviewed journal," and she explained that the professor should "review the CAUSES faculty handbook for guidance regarding scholarly activities versus service[-]related activities."  *Id.*  HNN Professor 2's final composite rating for 2018–19 was 1.7.  *Id.* at 5.

Or consider HNN Professor 3.  That instructor received a rare "Outstanding" rating in Scholarship from O'Hara in 2016–17.  Defs.' SUMF Ex. 2 at 47, ECF No. 34-2.  O'Hara's

---

[10]  Under a confidentiality agreement between the parties, the University produced records of other faculty evaluations in anonymized form.

[11]  O'Hara wrote: "[T]here is no evidence of a current record of research activities.  [HNN Professor 2's] last publication was in 2005 and her last invited lecture in 2013.  While her professional connections are strong and well aligned with the focus of the College and the University, [i]t is not clear how these professional connections translate into an active scholarly agenda.  The activities listed under the category of scholarship/research might have been more accurately listed under service."  Defs.' SUMF Ex. 2 at 46, ECF No. 34-2.

narrative was correspondingly laudatory.  She noted that the professor's "research goals seem to be primarily drawn [from] her PhD thesis and she seems well on her way to develop[ing] several successful publications . . . . She has submitted two abstracts and a book chapter . . ."  *Id.*  By the next year, however, O'Hara criticized HNN Professor 3's Scholarship as inadequate.  She noted that the professor "ha[d] not prepared a manuscript of her research for publication in a reputable journal" and counseled that HNN Professor 3 must "focus her primary attention on a publication in a peer reviewed journal."  Defs.' SUMF Ex. 3 at 40, ECF No. 34-3.

In short, the University contends that the comparator evidence shows that O'Hara never singled out Harris for adverse treatment.  In its telling, even if O'Hara misconstrued the proper bounds of "scholarship"—which the University far from concedes—then she applied her proclivity for peer-reviewed publishing across the board.

Harris also challenges the "Meets Expectations" ratings she received in Service for 2016–17 and 2017–18, as well as the "Meets Expectations" rating she received in Teaching for 2017–18.  Pl.'s Opp'n at 30–34.  The University's explanations for these ratings are like those for the Scholarship ratings:  O'Hara simply judged these categories differently than Harris, and her view matched how she rated other professors.

According to the University, O'Hara properly weighed Harris's numerous service activities against her failure in both years to "provide any goals or objectives for her service[-] related activities."  Defs.' SUMF Ex. 2 at 37, ECF No. 34-2; *id.* at 37.  Harris's self-assessment in this area was therefore deficient under the Seventh Master Agreement, which required faculty members to "explain or detail" how their service activities "related to the faculty members' teaching and student learning instead of merely listing" those activities.  Defs.' SUMF ¶ 119; *see also id.* Ex. 5 at 35, ECF No. 34-5 ("The faculty member is tasked with [the] responsibility to

relate these community-related activities within the Narrative to demonstrate the value to the faculty member's field and to the University.").  The University emphasizes that O'Hara downgraded other professors for the same deficiency in their self-assessments.  *See* Defs.' Reply to Pl.'s Opp'n ("Reply") at 19, ECF No. 37.

The same is true with the "Meets Expectations" rating that O'Hara gave Harris for Teaching in 2017–18.  O'Hara wrote that Harris seemed to excel in this area but failed to articulate her success by explaining her goals and how she met them.  O'Hara wrote in full:

> Dr. Harris meets several of the evaluation components for the category of teaching.  However, there are no explicitly stated goals and objectives that relate to her teaching activities, and show how these activities advance the goals and objectives that Dr. Harris has set for herself.  Some of her goals are implied (service, public speaking, community engagement…) and seem to be well aligned with the reaching objectives of the College and the University.  It should therefore be relatively easy for Dr. Harris to clearly articulate her professional goals and objectives in the area of teaching.  *Meets Expectations.*

Defs.' SUMF Ex. 2 at 36, ECF No. 34-2.  The University notes that the Master Agreement required a faculty member's self-assessment to answer specific questions that Harris's narrative failed to address.  *See* Defs.' SUMF Ex. 5 at 32–33, ECF No. 34-5 (listing seven open-ended questions).  Harris's Teaching rating bounced back up to "Outstanding" the next year.  This change makes sense, the University contends, because the narrative Harris submitted for the 2018–19 year was significantly longer, more detailed, and actually compliant with the Seventh Master Agreement's rubric.  *See* Reply at 21 (citing Defs.' SUMF Ex. 11 at 2–25, ECF No. 34-11).

Beyond comparisons to other professors on specific categories, the University also highlights O'Hara's stricter standards in general.  It notes that "it was a nearly universal experience in [Harris's] department for faculty members to have" lower ratings from O'Hara than from their department chair and peers.  Defs.' Mem. at 27.  This was true for all HNN

faculty in 2016–17 and 2017–18, and all but one HNN professor in 2018–19. *Id.* at 28 (citing Defs.' SUMF ¶¶ 153–84). And no faculty member in CAUSES was promoted from Associate Professor to Full Professor since O'Hara joined UDC in March 2012. Defs.' SUMF ¶ 219. So even if O'Hara's grading were unjustified, the University insists that she never singled out Harris.

### b. Harris's Rebuttal

The Court now asks whether Harris has "produced evidence sufficient for a reasonable jury to find that the [University]'s stated reason[s]" for her evaluation scores were "not the actual" reasons and O'Hara intentionally retaliated against her based on her advocacy. *Brady*, 520 F.3d at 495.

There are several ways a plaintiff can prove pretext: (1) establishing that the employer treated similarly situated individuals "more favorably in the same factual circumstances"; (2) showing that the employer "is making up or lying about the underlying facts that formed the predicate for the employment decision"; (3) pointing to "changes and inconsistencies in the stated reasons for the adverse action"; (4) exposing a "failure to follow established procedures or criteria"; and (5) recounting "discriminatory statements by the decisionmaker." *Id.*, 495 & n.3 (cleaned up). This list is not exhaustive. *See id.*

Harris's rebuttal never gets off the ground. Her response in the briefing is one sentence confirming that she relies on a combination of her prima facie case of retaliation "along with O'Hara's credibility problems." Pl.'s Opp'n at 52. To be sure, in "exceptional circumstances, the evidence supporting a plaintiff's prima facie case may, on its own, suffice to defeat the . . . presumption of validity" given the employer's explanation "and thus render summary judgment

improper." *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007). This is not one of those exceptional cases.

For starters, Harris's prima facie case suffers from serious flaws that also bear on the ultimate question of retaliation. *See George*, 407 F.3d at 412.

Harris offers temporal proximity as a basis to infer that Harris retaliated. *See* Pl.'s Opp'n at 51–52. But such an inference requires a "very close" temporal connection between the protected activities and the alleged adverse actions. *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012). Although there is no "bright-line" rule, courts have repeatedly referenced a three-month interval as pushing the limits of temporal proximity. *Id.* at 1357–58; *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (citing approvingly of cases finding three- and four-month intervals insufficient while holding that action taken 20 months later "suggest[ed], by itself, no causality at all"). And at summary judgment, temporal proximity alone cannot defeat the presumption that an employer's legitimate, nonretaliatory explanation is genuine. *Durant v. D.C. Gov't*, 875 F.3d 685, 700 (D.C. Cir. 2017).

For her retaliation claims under § 1981 and the DCHRA—that is, retaliation for "protesting race discrimination"—Harris points to two protected activities: (1) filing a race discrimination charge with the EEOC in June 2015, and (2) filing her initial lawsuit against UDC in June 2018. *See* Pl.'s Opp'n at 42–43.[12] The former significantly pre-dates the alleged adverse

---

[12] The Court does not understand Harris to be claiming that a third protected activity was her telling O'Hara in June 2014 not to treat her as a "lackey" and that "this" (presumably the campus?) "is not a plantation." Pl.'s Opp'n at 42. The reference reads instead like context for Harris's later EEOC charge. But if Harris did mean to plead that episode as a separate protected activity, it lacks merit. "Not every complaint garners its author protection under § 1981." *Bowyer v. District of Columbia*, 910 F. Supp. 2d 173, 209 (D.D.C. 2012) (cleaned up), *aff'd*, 793 F.3d 49 (D.C. Cir. 2015). A frustrated outburst to one's boss is not a protected activity, absent some connection to an attempt to vindicate rights under the statute. *See Welzel v. Bernstein*, 436 F. Supp. 2d 110, 119–22 (D.D.C. 2006) (rejecting as protected activity an employee's

actions, such as Harris's lower evaluation scores beginning in May 2017.  Likewise, for the

latter, Harris would ask a factfinder to link her evaluation scores to her filing a lawsuit in June

2018.  The reviews she received in May 2017 and May 2018 *predate* the lawsuit, while her May

2019 review occurred significantly—nearly a year—later.[13]  Harris's claims to a causal

connection are fatally weak.

Harris fares no better when she contests the University's explanations for her lower

performance ratings and argues that they were pretextual.  She stridently disputes O'Hara's

views on "scholarship," "teaching," and "service" and the ultimate ratings she received.  For

example, Harris protests that when evaluating "scholarship" O'Hara neglected her "mentoring

students," "go[ing] annually to conferences and bring[ing] the information back to her

classroom," and writing articles for "East of the River news magazine as a volunteer contributor

in the area of public health and nutrition."  Pl.'s Opp'n at 26–28.  That O'Hara disagreed these

activities counted as "scholarship" is understandable, and not by itself evidence of anything.[14]

---

admonition to superior to "watch what you say"); *cf. Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) ("While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition.").  In any event, this incident was even more removed in time from the retaliatory actions alleged by Harris.

[13]  A plaintiff may meet her burden here by showing that she "repeatedly engaged in protected activity during the period when she also experienced" the adverse actions.  *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006).  Although Harris cites this case, she fails to point to a string of other protected activities during this time.

[14]  Harris's effort to water down the traditional meaning of academic scholarship by pulling in soft, easily achievable metrics like conference attendance, mentoring, and newsletter writing reflects a broader debate within the academic community.  *Compare* David E. Balch, "Scholarship: More Than Just 'Publish or Perish,'" Faculty Focus (August 16, 2019), https://www.facultyfocus.com/articles/faculty-development/scholarship-publish-or-perish/, *and* John Saltmarsh & John Wooding, *Rewarding Community-Engaged Scholarship: A State University System Approach*, 27 Metro. Univs. 74 (2016), https://journals.iupui.edu/index.php/muj/article/view/21233, *with* Paul Gottfried, *"Publish or Perish" Isn't So Bad*, The James G. Martin Ctr. for Acad. Renewal (Sep. 23, 2015),

Recall also that O'Hara's ratings of Harris were twice appealed and twice upheld.  *See* Defs.' SUMF ¶¶ 193–97.  The reviews included two independent assessments of all three years of evaluations.  *Id.*  Harris would ask a jury to second-guess university administrators on applying their own evaluation rubric to such matters as the merits of published vs. unpublished scholarship, and then have them conclude that the differences must have resulted from retaliatory animus.

This will not do.  Neither the Court nor a jury is a "super-personnel department" able to reevaluate the merits of Harris's performance as an educator.  *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999).  And the Court "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive."  *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014) (cleaned up).  This prohibition is if anything more robust in the academic context.  *Cf. Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) (courts must "show great respect for [a] faculty's professional judgment" when "asked to review the substance of a genuinely academic decision.").

But suppose Harris could convince a jury that O'Hara was objectively *wrong* about her interpretation of "scholarship" or the other evaluation criteria.  That would still not be enough.  O'Hara objectively misapplying the criteria to Harris's detriment could stem from bias.  But it could also reflect a good-faith error.  And the latter does not support a finding of discrimination or retaliation.  *See Brady*, 520 F.3d at 495 ("an employer's action may be based on a good faith belief, even though the reason may turn out in retrospect to be mistaken or false.").

---

https://www.jamesgmartin.center/2015/09/publish-or-perish-isnt-so-bad/ ("Although the onetime emphasis in some universities on research and publication may have been excessive, the refusal to weigh these factors as significant criteria for academic advancement has engendered even worse results.").  Even if it were the Court's job to decide such a dispute—which it is not—the Court is entirely unconvinced by Harris's argument.

Indeed, "an employer's failure to follow its own regulations and procedures, alone, may not be sufficient to support the conclusion that its explanation for the challenged employment action is pretextual." *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556 (D.C. Cir. 1997) (cleaned up). If O'Hara relied on an idiosyncratic definition of "scholarship," for example, the record reveals that she did so when evaluating other professors too. And "[w]hen an employer's departure from the prescribed procedure has become the norm, that departure lends no support at all to the plaintiff's inference that the employer's departure is a pretext" for retaliation. *Id.* (cleaned up). That O'Hara was a strict evaluator and administrator does not show that she retaliated against Harris; the adverse actions must be caused by a protected activity. *See Harris*, 791 F.3d at 68–69 (requiring "causal connection").

Harris hangs her hat on O'Hara's supposed "credibility problems," Pl.'s Opp'n at 52, and argues that her case should head to a jury as a result, *see, e.g.*, *id.* at 24. But even if O'Hara's deposition testimony were suspect, that alone would not necessarily get Harris over the finish line. *See Paquin v. Fed. Nat'l Mortg. Ass'n*, 119 F.3d 23, 30 (D.C. Cir. 1997) ("[a] deponent's inability to recall specifics three years later does not rebut" defendant's nondiscriminatory reasons); *Hairston*, 773 F.3d at 272 ("one party's failure to recall a conversation does not, on its own, create a genuine issue of material fact"); *see also Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1249 (D.C. Cir. 2011) ("[Plaintiff]'s submission thus boils down to the proposition that discrimination plaintiffs should receive jury trials as a matter of course, on the theory that the question whether the defendant was motivated by . . . bias is always a question of fact for a jury. But that is not the way the law has developed."). Harris still must make a jury question on the ultimate question of retaliation. She does not get anywhere by pouncing on minor discrepancies in O'Hara's recollection of events from several years back. *See, e.g.*, Pl.'s Opp'n at 31–32

(O'Hara failing to properly recall what rating she gave Harris in particular category in particular year), 43 (O'Hara misremembering when she first learned of certain charges by Harris).

"There may be no legitimate jury question . . . in a case in which a plaintiff has created only a weak issue of material fact as to whether the employer's explanation is untrue, and there is abundant independent evidence in the record" to the contrary. *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir. 1998) (en banc). That is what the Court faces. Harris's claim that retaliatory animus depressed her evaluations is dwarfed by the mountain of evidence that her scores instead resulted from O'Hara's consistent views on how to apply the evaluation rubric and Harris's repeated failure to explain her success in her self-assessments. This is not a case "premised upon evidence in the record from which a reasonable juror could find that, absent invidious [retaliation], the challenged employment decision was inexplicable." *Barbour*, 181 F.3d at 1346–47. Harris has failed to produce enough evidence that discredits the University's reasons and shows that the actions were retaliatory.

### 2. Denial of "Leadership Positions"

Apart from the evaluations, Harris vaguely claims that O'Hara retaliated against her by denying her "leadership positions." Pl.'s Opp'n at 45. This claim fails too.

To begin, Harris's briefing at summary judgment never even says what those "leadership positions" are. After examining Harris's complaint, the Court surmises that she meant (1) the chance to serve as Acting Director of the DPD program, and (2) a spot on a faculty hiring committee that convened in summer 2017. *See* Compl. ¶¶ 62, 72.

*First*, take the DPD directorship. This administrative post included no stipend or extra compensation. Defs.' SUMF ¶¶ 72–74. It became vacant when Ganganna, who was also the department chair, abruptly retired in June 2017 after 30 years in the position. *Id.* ¶ 48. O'Hara

ultimately appointed Harris as DPD Director in September 2018.  *Id.* ¶ 71.  So Harris apparently complains that she missed out on this title for about a year.

Visiting Professor Nancy Chapman held the role during the 2017–18 year.  *Id.* ¶ 69.  The University explains that O'Hara asked Chapman to serve as acting director for "legitimate, non-discriminatory reasons that included her long experience and background in nutrition and dietetics and her knowledge of ACEND" (the accrediting organization for nutrition programs), as well as because Harris "needed time to develop her record of published scholarship."  Defs.' Mem. at 48–49.  Facing this proffered explanation, Harris could seek to establish that "a reasonable employer would have found [her] to be significantly better qualified for the job."  *Aka*, 156 F.3d at 1294.  Or she could expose other flaws in the explanation, advancing evidence that it was fabricated.  *Id.* at 1295.

Harris does neither.  Her brief at summary judgment does not respond to the University's explanation, so she concedes it.  *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[I]f a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded."); *Consol. Edison Co. of N.Y., Inc. v. FERC*, 510 F.3d 333, 340 (D.C. Cir. 2007) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (cleaned up)).[15]  More, recall

---

[15]  Had Harris responded, she would have faced an uphill battle overcoming Chapman's apparent qualifications and O'Hara's straightforward explanation.  More, Harris's own statement of facts suggests that O'Hara named Harris permanent DPD Director in September 2018 once she learned about the lawsuit that Harris filed in June 2018.  Pl.'s SOMF at 24.  So if anything, far from facing retaliation for filing that lawsuit, Harris immediately secured a role that she coveted. If Harris's speculation as to O'Hara's motives is true, it could suggest that O'Hara feared the lawsuit was meritorious and tried to cover up *discrimination* on her part.  But it dooms any argument that O'Hara *retaliated* against Harris and denied her the DPD Directorship *because of* the lawsuit.

that Harris complains the she already had too much on her plate at that time.  *See, e.g.*, Pl.'s

Opp'n at 49 (explaining Harris "did not have enough hours in her day and week to teach her

overload of classes and labs, mentor students and handle existing College and University

obligations as a result of her being the only regular Nutrition Department faculty member

representing her department").  The Court struggles to see how the failure to add administrative

responsibilities in such a situation could be retaliatory.

*Second*:  a spot on the faculty hiring committee in the summer 2017.  Although Harris

vaguely mentions being denied "leadership positions" by O'Hara, Pl.'s Opp'n at 45, neither party

discusses the faulty hiring committee.  So the Court considers this argument abandoned.  *See*

*Jeffries v. Barr*, 965 F.3d 843, 860–61 (D.C. Cir. 2020) ("This Court is not in the habit of doing

parties' lawyering for them, and we decline to take up that task now."); *Jones v. Kirchner*, 835

F.3d 74, 83 (D.C. Cir. 2016) ("[J]udges are not like pigs, hunting for truffles buried in briefs or

in the record . . . ." (cleaned up)).

But for good measure, the Court doubts Harris could make a prima facie case of

retaliation on this front had she tried—and much more advance a triable case on pretext.  Both

snubs—a spot on the hiring committee and the DPD Directorship—occurred in summer 2017.

*See* Defs.' SUMF ¶¶ 49, 55, 69.  As with Harris's evaluations, neither closely followed the

alleged protected activities occurring in June 2015 (filing race discrimination charge) and June

2018 (Harris filing initial lawsuit).  *See* Pl.'s Opp'n at 42–43; *Hamilton*, 666 F.3d at 357 ("very

close" temporal connection needed to support inference of causation).  More, O'Hara assigned

Harris to serve as the chair or member of faculty search committees on past occasions, including

those closer to her June 2015 EEOC charge.  Defs.' SUMF ¶ 58.  Harris would have to convince

a jury that O'Hara held onto her grudge for years, while in the meantime appointing Harris to

several hiring committees, before finally denying her a spot on one to get her revenge.  This is implausible.

Nor is it even clear that losing a chance to serve on an uncompensated, ad hoc committee is an actionable adverse event.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (explaining that for retaliation claim plaintiff must show "that a reasonable employee would have found the challenged action materially adverse" meaning "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination").  And selecting a faculty member to join a multimember committee, where the selector presumably considers not only the individual qualifications of each candidate but also the complementing attributes of all members, is precisely the kind of personnel decision that factfinders must steer clear from second-guessing absent overt retaliation.  *See Barbour*, 181 F.3d at 1346.

In short, even if Harris had properly put the withheld leadership positions at issue—which she has not—the record lacks evidence for a reasonable jury to infer retaliation based on them.

### 3.  Increased Workload

Harris also alleges that O'Hara "overload[ed] [her] with courses to prevent success in one area of scholarship that O'Hara deemed was credibility-worth[y] – peer-reviewed publications" without increasing Harris's compensation.  Pl.'s Opp'n at 45.

A change in workload can support a discrimination or retaliation claim.  *See, e.g.*, *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010) ("A reasonable employee might well be dissuaded from filing an EEO complaint if she thought her employer would retaliate by burying her in work"); *Mosleh v. Howard Univ.*, No. 1:19-CV-00339 (CJN), 2020 WL 956527, at *6 (D.D.C. Feb. 27, 2020) (finding sufficient allegations that university retaliated against

professor "by increasing his teaching load and by reassigning him undergraduate, instead of graduate, courses outside his area of expertise"). So far, so good, for Harris.

Yet Harris failed to mention this alleged adverse action anywhere in her complaint. Unsurprisingly, then, the parties never developed a proper record on this front. Harris still asserts in her brief that during the 2017–18 academic year she had to teach 76.5 professional units rather than 64 units, and she blames O'Hara for not relieving her of that burden. *Id.* at 48–49. For support she cites only a declaration that she signed *after* discovery closed, which she appended to her summary judgment brief. "It is 'axiomatic' that a party may not amend [her] complaint through an opposition brief." *Singh v. District of Columbia*, 55 F. Supp. 3d 55, 70 (D.D.C. 2014). The Court cannot allow Harris to sneak in this extra theory of liability.

Even if the Court did, Harris's theory is doomed to fail absent more direct evidence of retaliation. Recall that the 2017–18 schoolyear followed a summer when three professors in the nutrition and dietetics program resigned, triggering what the parties agree was "an urgent staffing situation." Pl.'s SOMF at 17. Although O'Hara quickly hired a few visiting professors, Harris's teaching load understandably increased. *Id.* Harris's theory appears to be that O'Hara failed to ameliorate this hardship out of spite. Pl.'s Opp'n at 49–50. But the nonretaliatory basis for the increased workload—the urgent staffing situation—is apparent, and Harris offers no evidence that O'Hara singled her out compared to her colleagues. This theory is not actionable.[16]

---

[16] If Harris believed she was owed more for this busier year, she was of course free to bring a breach of contract claim or seek arbitration as her employment contract(s) provided.

#### 4. Hostile Behavior

Harris lastly claims that O'Hara marginalized her in the workplace.  Among other slights, she says O'Hara "exclud[ed] her from meetings, ignor[ed] her points of view," and exhibited "hostility" through "facial expressions and dismissive statements."  Pl.'s Opp'n at 47–48.

Harris and O'Hara had a strained working relationship.  That much is clear.  "The Supreme Court, however, has emphasized that sporadic verbal altercations or disagreements do not qualify as adverse actions for purposes of retaliation claims."  *Baloch*, 550 F.3d at 119.  Courts embrace an "objectively tangible harm requirement" that "guards against both judicial micromanagement of business practices . . . and frivolous suits over insignificant slights."  *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (cleaned up).  At bottom, illegal retaliation means conduct that would "dissuade a reasonable worker from making or supporting a charge of discrimination."  *Burlington*, 548 U.S. at 57.  So plaintiffs must show "*material* adversity" not "trivial harms," as federal employment law "does not set forth a general civility code for the American workplace."  *Id.* at 68 (emphasis in original).

Harris fixates on the type of petty, intangible harms that do not support retaliation claims suitable for court.  *See Baloch*, 550 F.3d at 1199 (rejecting "profanity-laden yelling as actionable adverse actions" for retaliation claim); *Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015) (rejecting "occasional name-calling, rude emails, lost tempers and workplace disagreements"); *Brooks v. Grundmann*, 748 F.3d 1273, 1277–78 (D.C. Cir. 2014) ("the ordinary tribulations of the workplace, [i.e.,] a series of petty insults, vindictive behavior, and angry recriminations . . . are not actionable" (cleaned up)).  Federal law allows coworkers to not get along.  Even rude,

harsh, or unfair workplace slights are not adverse actions supporting a retaliation claim.[17]  Harris cannot rely on O'Hara's alleged rudeness for a retaliation claim.

*     *     *

Harris advanced several types of adverse actions stemming from O'Hara's retaliation.  In none of them did Harris identify evidence in the record from which a reasonable jury could conclude that the University's proffered legitimate, non-retaliatory reasons were pretextual.  *See Brady*, 520 F.3d at 494.  The Court will therefore grant the University's motion for summary judgment on Counts II and IV.

### B.  Retaliation for First Amendment Activity (Count V)

Harris also claims that O'Hara retaliated against her for speaking out on matters of public concern.  Compl. ¶¶ 159–71.  A four-element test governs public employees' retaliation claims under the First Amendment.  To prevail, Harris (1) must have spoken as a citizen on a matter of public concern; (2) her interest in speaking on those matters must outweigh UDC's interest as an employer in promoting efficiency; (3) her protected speech must have been a substantial or motivating factor in prompting the retaliation; and (4) UDC must be unable to show that it would have taken the same retaliatory actions without the protected speech.  *LeFande v. District of Columbia*, 841 F.3d 485, 494 (D.C. Cir. 2016).  The first two elements are legal questions, while the latter two are factual.  *Id.*

---

[17]  Harris is correct that a "plaintiff may bring a special type of retaliation claim based on a 'hostile work environment' by alleging a series of individual acts that may not be actionable on their own but become actionable due to their cumulative effect."  Pl.'s Opp'n at 47 (quoting *Menoken v. Dhillon*, 975 F.3d 1, 5–6 (D.C. Cir. 2020)) (cleaned up).  But here again, Harris failed to bring such a claim in her complaint.  And she cannot slip a new claim into the case now.  *See Singh*, 55 F. Supp. 3d at 70.  Even if Harris properly pled the claim, the record lacks evidence that O'Hara's conduct was "severe or pervasive enough" to "alter the conditions of [Harris's] employment and create an abusive working environment."  *Menoken*, 975 F.3d at 6 (cleaned up).  Isolated slights are not enough.

The first element distinguishes a First Amendment claim from employment-focused whistleblower claims protected by statute. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). A "public employee speaks without First Amendment protection when he reports conduct that interferes with his job responsibilities, even if the report is made outside his chain of command." *Winder v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009). The inquiry into whether speech was part of an employee's duties is "a practical one," considering the employee's role and the nature of the complaints. *Mpoy v. Fenty*, 901 F. Supp. 2d 144, 153–54 (D.D.C. 2012) (finding that teacher's email to Chancellor of D.C. public schools complaining about classroom conditions, coworkers' conduct, and pressure by principal to falsify test scores not protected), *aff'd sub nom. Mpoy v. Rhee*, 758 F.3d 285, 291–94 (D.C. Cir. 2014).

Harris points to five instances when she allegedly exercised her First Amendment rights. Pl.'s Opp'n at 17–19. Harris spoke as a citizen on a matter of public concern in none of them.

*First*: Harris's appearance at a December 2016 meeting of the UDC Board of Trustees, which O'Hara also attended. Defs.' SUMF ¶ 269. Harris testified to oppose the creation of a Bachelor of Arts degree in Urban Sustainability. *Id.* Her remarks "did not include any report or complaint about racial discrimination, national origin discrimination, reprisal for protected activity, fraud, waste, or abuse, or any other kind of unlawful activity by UDC or its representatives." *Id.* ¶ 271; *accord* Pl.'s SOMF at 79 ("Admitted."). Nor was there anything otherwise approaching a matter of public interest. Defs.' SUMF Ex. 19 at 7–10, ECF No. 34-19. At most her criticisms highlighted UDC's use of non-regular faculty to teach students—which

she called "union-busting"—yet she largely focused on the academic drawbacks of adding the major. *Id.* The Court struggles to imagine a complaint more rooted in Harris's official duties as a professor and administrator. She was not testifying as a citizen on a matter of public concern. *See Garcetti*, 547 U.S. at 421 (2006); *Alves v. Bd. of Regents of the Univ. Sys. of Georgia*, 804 F.3d 1149, 1163–68 (11th Cir. 2015) (university employees spoke as employees about workplace matters—not citizens about issues of public concern—when submitting memorandum to university officials alleging poor leadership and mismanagement by superior).

*Second*: Harris's conversation with a USDA evaluator in February 2017. The Court addresses this allegation more fully when examining Harris's retaliation claim under the False Claims Act. *See infra* at III.C. But in short, Harris asserts that she orally reported to a USDA official that the school was diverting USDA grant funds away from their proper use. Pl.'s SOMF at 84–85. This is the kind of targeted workplace concern that impacted Harris's ability to successfully fulfill her job. After all, Harris considered herself the "custodian" of the school's nutrition and dietetics program, Defs.' SUMF ¶ 223, and she felt entitled to contact USDA directly back in 2012 for a meeting to discuss funding sources for her students, *id.* ¶¶ 27, 30. This self-serving reporting largely advanced Harris's workplace priorities.

It matters not that Harris reported the malfeasance "outside [her] chain of command." *Winder*, 566 F.3d at 215 (holding that public school transportation manager not entitled to First Amendment protection for testimony before D.C. Council and complaint to D.C. Inspector General); *see also Thompson v. District of Columbia*, 530 F.3d 914, 918 (D.C. Cir. 2008) (holding that chief of security for D.C. Lottery Board spoke in his official capacity when reporting financial misconduct to Lottery Board officials). Harris spoke as a university official to an auditor of the university at a university event about finer points of university

30

(mis)management that affected her ability to educate university students.  She was not on a proverbial soapbox in the public square.

*Third* and *fourth*:  Harris's communications with the UDC Board of Trustees in June 2018 and September 2018.  For the former, Harris sent a memorandum "opposing approval of a Ph.D. Program in Leadership and Entrepreneurship and questioning why the University was diverting resources to the proposed Ph.D. in [L]eadership and Entrepreneurship rather than into" preexisting academic programs.  Defs.' SUMF ¶ 273.  For the latter, Harris testified at a meeting of the Board's Audit, Budget, and Finance Committee to comment on an increase in student fees and highlight the harmful effects of rising costs.  *Id.* ¶ 274.

Rather than merely dissecting each sentence of testimony, "the Court must take a hard look at the context of the speech."  *Mpoy*, 758 F.3d at 292 (relying in part on fact that "the vast majority of [a reporting] email was government employee speech").  Both exchanges overall concerned school administration, and Harris's testimony flowed from her role as an educator and administrator; there would have been no occasion to share her perspective otherwise.  More, Harris's statements highlighted the detrimental effects of campus policies on professors such as herself.  *See, e.g.*, Defs.' SUMF Ex. 19 at 20–21, ECF No. 34-19 (asking for more teaching assistants and "more respect" for regular faculty members).  An employee such as Harris "speaks without First Amendment protection when [s]he reports conduct that interferes with [her] job responsibilities."  *Winder*, 566 F.3d at 215.

*Fifth*:  Harris's speech before the D.C. Council in February 2019, which O'Hara did not attend.  Defs.' SUMF ¶¶ 277–79.  The parties agree that Harris "criticized the University's 'equity imperative,' but did not make any report or complaint about racial discrimination, national origin discrimination, [or] reprisal against faculty or employees for reporting or

31

opposing discrimination or other unlawful activity." *Id.* ¶ 277.  Nor did Harris "make any report

or complaint about misappropriation of funds or fraud, waste, or abuse by UDC." *Id.* ¶ 278.  Her

testimony advanced a litany of complaints about UDC management, drawing from her

experience as a professor.[18]  "[A]lthough testimony before a city council might otherwise be just

the sort of citizen speech protected by the First Amendment, the uncommonly close relationship

between [Harris'] duties and [her] advocacy before the council precludes protection." *Winder*,

566 F.3d at 215.

Harris says she was always "speaking as a citizen and not on behalf of UDC" when

communicating with the D.C. Council and claims she stated that "explicitly."  Pl.'s Opp'n at 18.

Not so.  For support Harris cites a letter she sent to the D.C. Council *in July 2014* asking to meet.

*Id.* Ex. 15 at 2–4, ECF No. 36-15.  A letter from five years before does not determine the

character of Harris's 2019 speech.  And while the letter refers to Harris's long residency in the

District, it does not identify her as speaking as a concerned citizen.  In fact, she states her title in

the opening paragraph and closing signature.  *See id.* at 2–3 ("I am an Associate Professor of

Nutrition at UDC and an appointed member of the Executive Board of the UDC Faculty

Association"); *cf. Mpoy*, 758 F.3d at 294 ("[T]here is little doubt that [plaintiff] was using the

email" to report misconduct "in his capacity as a teacher" given he "identified himself by his job

title in both the opening paragraph and the closing signature.").

\*     \*     \*

---

[18]  *See, e.g.*, Council of the District of Columbia, *Committee of the Whole, Performance Oversight Hearing* (Feb. 28, 2019),
http://dc.granicus.com/MediaPlayer.php?view_id=2&clip_id=4904 ("I'm telling the reality from my vantage point, from faculty members, who—many aren't here because they are afraid to be here or . . . they've lost faith."); ("Faculty members . . . we are not part of the equity imperative, because there is not anything equitable about our salaries, about our work conditions . . .").

In all five episodes, Harris spoke as a professor on university matters, not as a citizen on matters of public concern.  "[W]hile the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance."  *Garcetti*, 547 U.S. at 420 (cleaned up).  That is what Harris seeks here and what the Court cannot allow.

Even if one or more of Harris's communications came as a citizen on a matter of public concern, she would still face the futile task of showing that her protected speech was a motivating factor in O'Hara undertaking actions she would not have otherwise.  *See LeFande*, 841 F.3d at 494.  None of the episodes occurred before-but-suggestively-near any of the alleged retaliatory actions—the withheld leadership positions in summer 2017, assignment of an increased teaching load in fall 2017, and low evaluations in May 2017, 2018, and 2019.  And Harris would have to provide evidence to rebut the University's explanations for O'Hara's actions, which the Court already found that Harris failed to do.  *See supra* III.A.1.b.  So the Court will grant summary judgment to the University on Count V.

### C.  Retaliation under the False Claims Act (Count VII)

Harris lastly advances a retaliation claim under the False Claims Act ("FCA").  Compl. ¶¶ 185–97.  The FCA outlaws knowingly presenting "a false or fraudulent claim for payment" to the federal government.  31 U.S.C. § 3729(a)(1)(A).  To succeed on a retaliation claim, an employee must prove that she undertook a "protected activity" and her employer retaliated against her "because of" it.  *United States ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1237 (D.C. Cir. 2012).  For the latter, in this circuit an employee must show that her employer knew she was engaged in a protected activity and that the retaliation was "motivated, at least in part,

by" her protected activity. *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998) (cleaned up).[19]

"Thus boiled down to its essentials, an FCA retaliation claim requires: (1) protected activity; (2) notice; and (3) adverse action taken in response to such protected activity." *Pitts v. Howard Univ.*, 111 F. Supp. 3d 9, 17 (D.D.C. 2015). Protected activities include "lawful acts done by the employee . . . in furtherance of an action under" the FCA "or other efforts to stop [one] or more violations of" the FCA. 31 U.S.C. § 3730(h)(1).

The *McDonnell Douglas* burden-shifting framework applies to FCA retaliation claims too. *Schweizer*, 677 F.3d at 1240–41. The Court has already found that the University provided a sufficient, non-retaliatory basis for the alleged retaliatory actions: Harris's low evaluations, withheld leadership opportunities, and increased workload. *See supra* III.A.1–3. So the only remaining issue is if Harris has produced evidence for a reasonable factfinder to infer that FCA retaliation was the real impetus. That inquiry requires examining what her prima facie case would be.

Harris alleges that her protected activity was her seeking to stop FCA violations by reporting UDC's misappropriation of landgrant funds from the USDA. Pl.'s Opp'n at 37. At one point in her brief she says that she "protested O'Hara's use of USDA land grant funds to pay land grant faculty to teach academic courses" on "multiple instances," *id.* at 38, but it is unclear which instances she means. The Court will address all three instances that she mentions.

---

[19] *But see Nesbitt v. Candler Cty.*, 945 F.3d 1355, 1358–62 (11th Cir. 2020) (rejecting this "motivating factor standard of causation" rooted in legislative history and giving phrase "because of" its "plain meaning" as required by intervening Supreme Court case law not considered by D.C. Circuit).

*First*, Harris appears to concede one reporting event as inapplicable.  In responding to the University's arguments about her September 2018 testimony before the Audit, Budget, and Finance Committee of the UDC Board, Harris denies "that she challenged misuse of USDA funds in September 2018."  *Id.* at 39.  The Court agrees, as the record reflects that Harris "did not make any comment on . . . reprisal for opposing unlawful activity, misuse or misappropriation of USDA funds, fraud, waste or abuse, or any other kind of unlawful activity by UDC or its representatives."  Defs.' SUMF ¶ 275; *accord* Pl.'s SOMF at 79 ("Admitted."); *see also* Defs.' SUMF Ex. 19 at 18–21, ECF No. 34-19.  There is no basis to treat the September 2018 testimony as a protected activity.

*Second*, Harris vaguely suggests that her December 2016 testimony raised "concerns" about the "funding stream" for landgrant staff.  Pl.'s Opp'n at 39.  She cannot massage those words into an FCA report.  As the Court explained above, Harris testified to oppose the creation of a Bachelor of Arts degree in Urban Sustainability.  Defs.' SUMF ¶ 269.  The parties again agree that her remarks "did not include any report or complaint about . . . reprisal for protected activity, fraud, waste, or abuse, or any other kind of unlawful activity by UDC or its representatives."  *Id.* ¶ 271; *accord* Pl.'s SOMF at 79–80 ("Admitted.").  And while her testimony mentions the phrase "funding stream," it does so only in the context of explaining that the University will have to "address" the "funding stream" for new faculty to teach courses in the proposed Urban Sustainability program.  Defs.' SUMF Ex. 19 at 10, ECF No. 34-19.  Her testimony cannot plausibly be read as reporting an FCA violation or an effort to thwart one.

*Third*, Harris points to her conversation with a USDA auditor in February 2017, when USDA representatives visited campus.  Pl.'s SOMF at 84–85.  Harris alleges that she pulled a representative aside after a presentation and shared her concerns about the school's

"misappropriation" of USDA funds.  *Id.*  The "alarmed" USDA representative explained that she might "have to report" the claims to USDA leadership.  Pl.'s Opp'n Ex. 9 at 27, ECF No. 36-9. Harris says that O'Hara stood "within two to three feet" and was "eavesdropping" on the encounter.  Pl.'s SOMF at 85.  O'Hara testified that she does not recall any such conversation. Pl.'s Opp'n Ex. 7 at 62, ECF No. 36-7.

The University protests that Harris's self-serving testimony is unreliable and cannot be used to defeat summary judgment.  Defs.' Mem. at 19.  It cites old cases for an obsolete rule.  In fact, "parties, like other fact witnesses, are legally competent to give material testimony" and "in many kinds of cases, parties are the key, or even sole, witnesses" to material events.  *Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016) (noting that it is factfinder's role to discount sworn testimony based on bias); *see also Camara v. Mastro's Restaurants LLC*, 952 F.3d 372, 374 (D.C. Cir. 2020) ("the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment" (cleaned up)).  For now, the Court will assume the truth of Harris's testimony, including her convenient memory that she "had begun to talk about the defrauding [of] the federal government" to the USDA representative right when O'Hara walked up.  Pl.'s Opp'n Ex. 9 at 26–27, ECF No. 36-9.  And the Court will accept Harris's assertions of why she reasonably believed she was deterring fraud against the government.  *See* Pl's SOMF at 83–85.

With that reporting and intent, plus O'Hara's awareness, Harris meets the first two elements of an FCA claim.  *See Pitts*, 111 F. Supp. 3d at 17 (requiring protected activity, notice, and adverse action taken in response).  But Harris again stumbles on the alleged retaliatory actions and on providing evidence on the ultimate question of retaliation.  She fares no better than she did with the Section 1981 claims, for which the Court found the alleged retaliatory

actions unpled, unsupported, or both.  *See supra* III.A.  Harris analogizes her facts to those in *Singletary v. Howard University*, *see* Pl.'s Opp'n at 40, but that does not help her.  That case concerned sufficient pleading standards at the motion to dismiss stage, not the evidence required at summary judgment.  *See Singletary v. Howard Univ.*, 939 F.3d 287, 295–303 (D.C. Cir. 2019); *e.g.*, at 298 ("All that is necessary at this stage of the inquiry is that Singletary's proposed complaint plausibly allege" a claim).

At best, Harris can point to a weak temporal connection between her FCA reporting on February 10, 2017, and receiving a low performance evaluation from O'Hara on May 30, 2017. *See* Pl.'s Opp'n at 38; *see also* Compl. ¶¶ 37, 55 (providing dates).  These dates stretch the outer limits of temporal proximity permitting an inference of connection.  *See Hamilton*, 666 F.3d at 1357–58 (noting courts' reference to three-month limit).  Even so, while mere proximity may be enough at the motion to dismiss stage, more is required to survive summary judgment.  *See Durant*, 875 F.3d at 700 ("Where . . . an employer has provided a legitimate, nonretaliatory reason for its employment action, positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanation is genuine."); *see also Woodruff*, 482 F.3d at 530 (noting that to hold otherwise "would effectively grant employees" who engaged in a protected activity a "period of immunity" from summary judgment no matter the strength of the claim).

Because Harris advances no evidence of causation beyond temporal proximity, there is nothing for a factfinder to credit instead of the University's well-supported explanations for all O'Hara's conduct.  The Court will grant summary judgment to the University on Count VII.

## IV.  CONCLUSION

There is no question that O'Hara was a tough grader when it came to teacher evaluations. Perhaps Harris is not a tough grader, or perhaps she is but thinks professors deserve a more

forgiving standard.  In any event, she has not shown that O'Hara singled her out for unfair treatment, and that is what matters here.

In her four years in federal court, Harris has aired many grievances against UDC and especially O'Hara.  Maybe some are justified.  But for none has Harris provided enough evidence that the adversities resulted from retaliation violating federal or District law.  While this unfortunate, public feud may continue, it may not add a federal jury to the audience.

For these reasons, the Court will grant the University's motion for summary judgment.  A separate Order will issue.


Dated:  September 25, 2021                    _____
                                              TREVOR N. McFADDEN, U.S.D.J.